## SIMONS–MAYRANT CO. v. ATLANTIC COAST LINE R. CO.

### (District Court, D. South Carolina. July 21, 1913.)

1. REFERENCE (§ 99*)—FINDING OF MASTER—CONFLICTING EVIDENCE—EXCEPTIONS.

In an action against a railroad company for injuries to a steam shovel in transportation, a master's finding that verbal notice was given to defendant before shipment that plaintiff needed the shovel for use on a contract under which it would be liable for a penalty of $50 for each day beyond the time limit provided for in the contract, based entirely on the conflicting evidence of two witnesses, would not be reversed by the court on exceptions.

[Ed. Note.—For other cases, see Reference, Cent. Dig. §§ 148–156; Dec. Dig. § 99.*]

2. CARRIERS (§ 134*)—TRANSPORTATION OF MACHINERY—INJURIES—MASTER'S FINDINGS—EVIDENCE.

In an action against a carrier for injuries to a steam shovel, evidence *held* insufficient to support a master's finding that a further injury following derailment of the shovel after delivery to the owners at destination was due to undiscovered and unrepaired injuries resulting from the original wreck of the shovel while in the custody of the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 588–592, 607; Dec. Dig. § 134.*]

3. CARRIERS (§ 105*)—SPECIAL DAMAGES—NOTICE.

Where, in an action against a carrier for injuries to a steam shovel during transportation to the place where plaintiff intended to use the shovel in certain contract work, the only notice of special damages given to the carrier that would result from injury to the shovel beyond necessary repairs was from the delay which the carrier was notified would cause a loss of a contract penalty of $50 a day, plaintiff not having suffered such penalty and the contract having been terminated for other reasons and the injuries to the shovel having been fully repaired, plaintiff was only entitled to recover nominal damages.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 451–458; Dec. Dig. § 105.*]

4. CARRIERS (§ 105*)—SPECIAL DAMAGE—CARRIERS.

Special damages cannot be recovered against a carrier for delay in delivering machinery required by the plaintiff for contract work unless the carrier had notice of the circumstances from which such special damage might reasonably be expected to result at the time the contract of shipment was made, and it is further shown that the damages suffered were reasonably within the damages contemplated at the time the notice was given.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 451–458; Dec. Dig. § 105.*]

At Law. Action by the Simons-Mayrant Company against the Atlantic Coast Line Railroad Company. Judgment for plaintiff for nominal damages.

Whaley & Bissell and Mitchell & Smith, all of Charleston, S. C., for plaintiff.

W. Huger Fitz Simons, of Charleston, S. C., for defendant.

CONNOR, District Judge. This is an action for the recovery of special damages alleged to have been sustained by reason of the delay in shipment of, and injuries sustained by, a steam shovel delivered to

defendant at Lakeland, Fla., for transportation and delivery to plaintiff at Ft. Lawn, or Great Falls, S. C. The plaintiff alleges that, prior to the receipt for shipment, defendant was notified that the shovel was to be used by plaintiff in performance of a contract which it had theretofore entered into with the Southern Power Company at Great Falls, S. C.; that prompt shipment and delivery was necessary to enable plaintiff to perform the work (excavation of a canal); that the contract of shipment was entered into by defendant with notice that special damage would be sustained if the shovel was not promptly shipped and delivered; that defendant negligently delayed the shipment and delivery and so negligently handled said shovel that it was injured, etc. Defendant denied that, at the time of, or prior to, said shipment, it had notice of the contract existing between plaintiff and the Southern Power Company or the purpose for which the shovel was to be used at Great Falls. It further denied negligent delay in the shipment and delivery of the shovel. It admitted that the shovel was, while in transit, derailed at Savannah, Ga., and injured, but alleged that it was repaired, put in as good condition as when received by it, and delivered to plaintiff at Great Falls in such good condition. The cause was, by consent, referred to Mr. George H. Moffett, as special master, to hear the evidence and report his conclusions of fact and of law to the court, with the right of either, or both, parties to file exceptions, etc. The special master filed his report, to which both parties filed exceptions.

[1] The master finds:

"That verbal notice was given, before the shipment, to the defendant to the effect that Simons-Mayrant Company needed the shovel for use on a contract under which they were liable for a penalty of $50 a day for each day beyond the time limit provided for in the contract."

Defendant excepts to this finding of fact. Exceptions 1 to 7, inclusive, are directed to this phase of the case. The master sets out in his report the evidence which he deems relevant to this issue, being the testimony of Mr. S. Lewis Simons, secretary and treasurer of plaintiff company, and Mr. W. E. Renneker, commercial agent of defendant. Their testimony is contradictory and irreconcilable, except upon the theory that the memory of one of them has failed him. It is found by the master, and conceded by counsel, that both are men of high character for truth and integrity. Mr. Simons says that, several days before the shovel was shipped, he stated to Mr. Renneker that:

"We had bought this shovel to be used on a contract which we had for the Southern Power Company, Ft. Lawn; that it was a matter of vital importance for us to get the shovel; that our work was dependent on it; that there was a demurrage of $50 a day, and we would get $50 a day if we got through ahead of time. I urged (upon) him the importance of a prompt shipment, in getting it to us as soon as he possibly could."

Mr. Renneker says:

"My first connection with that shipment was that we solicited it from Simons-Mayrant Company; after ascertaining that the shipment would move from Lakeland, Fla., we received a letter from the Cameron & Barkley Company, or from Mr. Jenkins, the president, under date March 8, 1906, inclosing two bills of lading covering the shipment of one steam shovel on its own wheels in part, and requesting that we insert the rate in the bill of lading."

The shipment was made from Lakeland, Fla., by the Cameron-Barkley Company and bill of lading issued to them; no notice of the purpose for which it was to be used was given to defendant's agent at Lakeland. The foregoing is the only direct evidence upon the issue in regard to notice upon which the claim for special damage is founded. Several years elapsed between the date of the transaction and the hearing of the cause. There is evidence of conversations and correspondence between Mr. Simons and Mr. Renneker subsequent to the shipment and issuing of the bill of lading, from which the parties draw differing inferences in respect to the principal or direct evidence. Their subsequent conversation and letters are capable of different constructions. The master rests his conclusion upon the belief on his part that it is probable that Mr. Renneker had forgotten the first conversation, in regard to which Mr. Simons testifies with much confidence. The master was personally acquainted with both witnesses, heard them, saw their manner while testifying, etc. In view of the principle by which courts are governed, in passing upon exceptions to findings of fact by the master, I would not think myself justified in reversing his conclusion. The defendant's exception to the first finding of fact is not sustained.

[2] The master finds that the shovel was delivered to defendant's agent at Lakeland, Fla., on February 28, 1906; arrived at Savannah March 8th; was derailed at Savannah and fell into Bilboa creek on March 14, 1906; was raised (that is, taken from the canal) March 21st and "survey for damages made April 2, 1906"; repairs commenced April 4, and completed April 18, 1906. It was accepted by the Seaboard Air Line Railway Company April 24th, reached Ft. Lawn, S. C., May 9th, and delivered to plaintiff May 12, 1906. He further finds: That from the date of shipment at Lakeland, Fla., two weeks, or March 14th, was a reasonable time within which it should have reached Ft. Lawn or Great Falls, S. C. That on March 21, 1906, plaintiff was prepared to receive it, and therefore "this date is found when the shovel should have arrived, and that the delay beyond this date was caused by the negligence on the part of defendant, for which it would be liable." There is no controversy in regard to these events or the dates upon which they occurred. The master further finds:

"From the testimony it appears that the shovel was derailed and thrown into Bilboa Creek, at Savannah, and allowed to remain in the canal for one week. From the testimony it appears that one truck was badly damaged, one side sill of the car damaged and bent, the piping was broken, the pump was broken, the boiler knocked loose from the machine and out of the machine altogether, the beam of the car was bent, and the house was completely broken off, the iron holding the roof and parts of the house bent and twisted. The small boiler connections were broken and the injector gone, the top valve gone, the small gauge gone, the gauge cock gone, and a portion of the castings. The repairs were made by the railroad company at Savannah, consumed two weeks, and cost $271.50. The testimony of the railroad witnesses tend to show that, after the repairs, the shovel was tested and found to be in as good condition as it was when received."

There is no substantial controversy respecting the extent and character of the injuries sustained by the shovel at Savannah, which were visible to the witnesses who saw, examined, and repaired it. A careful

examination of the testimony of all of the witnesses who testified regarding the condition of the shovel, as disclosed by an examination at Savannah, and the repairs thereto, convinces me that the testimony of Mr. Wright, superintendent, Mr. Sprowl, superintendent of motive power, Mr. McPheren, machine shop foreman, Mr. Hampton, foreman, freight car department, Mr. Petronovitch, foreman of boiler makers, all of whom examined the shovel and either superintended or assisted in its repair, some of whom tested it after repairing, and who testified intelligently and frankly, is reliable and entitled to credit. The testimony of Mr. Tovey in respect to his capacity to form an opinion, his opportunity for doing so, etc., should not be taken as discrediting these witnesses. In many material respects he does not contradict them; he did not see the shovel after the repairs were made. He is not a machinist and only saw the shovel while at Savannah, on one occasion, and but for one day, April 9, 1906, nine days prior to the completion of the repairs. The testimony shows that all injuries which were discovered while the shovel was in the defendant's shops at Savannah were repaired. The claim of the plaintiff is, to a large extent, dependent upon the question whether it sustained injuries, which were not discovered by the witnesses, which caused further injury to the shovel.

The testimony shows that it was delivered to the Seaboard Air Line Railway Company and by said company delivered to the Lancaster & Chester Railroad Company and by said carrier delivered to (that is, placed upon the track of) the Simons-Mayrant Company at Ft. Lawn or Great Falls on May 12, 1906, the point at which the work of excavation was to be done. In this connection the master makes the following finding:

"The shovel was received at its destination by the Simons-Mayrant Company under notice from them that the shovel was received subject to any claims for damages on account of its condition after its receipt. The shovel was not thoroughly examined but was set up, and, on the day it was received it was being moved along the tracks of the Simons-Mayrant Company to a point where it was proposed to be worked, when a second derailment occurred, and the shovel fell down an embankment and was injured, necessitating its repair and a loss of three weeks time to plaintiff during which these repairs were made."

The master finds that this derailment was caused by the breaking of a casting and—

"that this occurred from the derailment in Savannah and must have been overlooked by the railroad and employés when the repairs were made, and that the subsequent derailment and injury to the shovel resulted therefrom."

Defendant challenges the correctness of this finding, insisting that:

"The master erred in finding that the break in the casting occurred from the derailment in Savannah and must have been overlooked by the railroad employés when repairs were made, and that the subsequent injury to the shovel at Great Falls resulted therefrom. The finding is purely conjectural and speculative, for the master himself says, 'There is no testimony as to when the break occurred,' and that the railroad witnesses testified that, after the repairs, the shovel was tested and found to be in as good condition as when received."

It appears that the shovel and its parts were shipped upon two cars; the former being on, and attached to, a car upon its own trucks. When plaintiff received the shovel at its destination, it gave notice that it did not waive any claims for damages; it is found "that no thorough examination was made at that time." The trucks upon which the shovel was carried were placed upon and were being moved along the track of the plaintiff when, at a point described by the witnesses with some variation, the trucks left the track, a casting holding the boom broke, causing the boom to swing at a right angle to the track, carrying the shovel over the embankment. The track was built by plaintiff company and had been in use some two weeks; the testimony as to the character and extent of the use made of the track before the derailment is conflicting. There is contradictory testimony as to the exact point, whether on the main track or a spur thereof, the derailment occurred; the plaintiff's witnesses describe the track, pointing out by means of a rough diagram, made by one of defendant's witnesses, where the derailment occurred; they say that the shovel was not on the spur. Mr. Leland says:

"It had not reached it, but I don't think it was very far from the beginning of the spur. (Page 66)."

Rosemond, for defendant, said that it was on the spur. (Page 20.) Mr. Stevenson, for plaintiff, says:

"We were taking it down the track to get it in position, and the rear truck left the track; that is, the truck away from the— It was the forward truck as the shovel was going; but the rear truck when the shovel was in operation, and the wheels left the track. That caused a jar to the shovel and the boom. I was noticing it very carefully; I was in direct charge of it, noticing it very carefully. If it had been a sail probably no damage would have been done, but the boom began swinging and as soon as it swung at right angles with the track the boom carried it over. There was a pin that went through the fore truck into the casting to hold the boom in position; this casting gave way."

This statement, to the extent quoted, is not contradicted. Mr. Royall says that there was a branch on the side of the embankment on which the track ran. Mr. Cuthbert points out on the plat the place at which the shovel went over; says it was "somewhere up here at the end of upper end of this track; there was a big bluff right up about there; this spur went in around a big hill up there; * * * was not on the spur track." He saw it "turn over." He says:

"I guess it was out of order. I don't know positively one way or the other."

Mr. Stevenson, for plaintiff, says that Mr. Rosemond was directed to take it up, and did so. He says that:

"There was a stream at the embankment where the shovel turned over; does not think it caused the derailment."

Mr. Rosemond who, it is conceded, took the shovel up after the derailment, and who is not in any way interested in the action, having no business or other relation with either party, is introduced by defendant. He says that the truck was on the spur track but in this respect is contradicted by the plaintiff's witnesses; the weight of the

evidence is against him on that question, although all agree that it was near the spur. He says:

"They had graded a spur track down the side of a branch, and, in digging in the hill, the soft dirt was on the side next to the branch, and I presume from the looks of it that the shovel had run up on this soft place and tipped over in the branch; the soft side of the branch being next to the track and run down considerably. I judge that that is what turned the shovel over. There was a grade up, as well as I remember; it ran up grade for a little ways, for a short space, and then turned over a kind of hump or rise in the track, and it was down grade when it turned over."

When asked whether the track was in good condition, he says:

"I would not consider that it was at this particular place where it turned over; it was too narrow and the bank was not sufficient to hold, on both sides, soft dirt. * * * I turned it back, worked over it several days." (Pages 20, 21.) "Did not see any broken castings; never noticed any."

The witness drew a diagram which he says shows where the shovel turned over. Plaintiff's witnesses do not agree with him in regard to the diagram. Upon cross-examination he says that he did not hear anything about any casting being found at the time, but:

"It strikes me that some two or three weeks afterwards there was something said about a broken casting; I am not sure about that. You righted the shovel up, did you not? Yes, sir. And you put it in shape after it was turned back up? I set it up; I did not do the pipe work. You did not see any broken castings at that time, did you? No, sir. You examined the shovel when you took it up, did you not? Oh, I looked over it; naturally I would."

There is some testimony, rather unsatisfactory in character, that the truck left the track because it was out of alignment. (Page 74.) The fact that it had come from Savannah, over the line of the Seaboard Air Line Railway and the Lancaster & Chester Railroad, tends to disprove this theory. In regard to the condition of the track, Mr. Royall, a witness for plaintiff, a civil engineer, who saw the place at which the shovel turned over, on cross-examination says that there was a branch at the point of derailment.

"My opinion is that the—well, I will have to put in an 'if,' because I did not see it, if that shovel ran off, before it started to turn, then it was very natural that the truck would be depressed on one side or the other; whichever way was the softest side, the jar would depress it on that side, and then that would get this shovel eccentric, and it would be very natural for any weight on one side or the other to continue the moving of the shovel on the other."

The fact that the shovel came safely, on the same truck, over the railway from Savannah to Ft. Lawn shows that the pin, or casting, did, under normal conditions, have sufficient strength to hold the boom in position. That the truck, leaving the track, was the immediate cause (that is, in order of time, the condition), which immediately preceded the derailment, is clear. It therefore becomes necessary to inquire why the truck left the track. This must have been caused either by some defect in, or injury to, the truck or the condition of the track. The burden of proof in this respect is on the plaintiff; the shovel was on its track in control of its employés. Several of plaintiff's witnesses testify that cars loaded with coal and cement had been carried over the track a short time before the shovel was derailed. The track had been

completed about two weeks before the derailment. Mr. Rosemond says that no coal cars had been carried over this track or on the spur; "never had any occasion to do so," etc. Different conclusions in respect to the condition of the track may be drawn from this testimony. I am unable to find that the truck was out of alignment. There is no direct evidence of it, and no such suggestion was made at the time of the derailment by any of the persons who saw it; the natural evidence is otherwise. There is sufficient evidence to sustain the conclusion that the truck left the track by reason of the physical condition of the latter. I have examined the testimony with care and am brought to this conclusion. There is ample evidence that swinging of the boom carrying the shovel over was caused by the pin, or casting, breaking. This is undoubtedly true; but lying behind this fact is the question whether the pin, or casting, broke by reason of the jar caused by the truck leaving the track or because it had been theretofore broken by the derailment at Savannah and overlooked by the mechanics who repaired it. The master finds that the break occurred at Savannah. The exception to this finding raises one of the determinative issues as to the damage claimed after the delivery of the shovel to plaintiff. The finding in this respect is necessarily dependent upon the weight to be attached to the evidence of plaintiff's witnesses. Several of them are interested in sustaining plaintiff's contention; they testify some six years after the event. Mr. Cuthbert, who locates the place of the derailment, was the assistant of Mr. Stevenson, and when asked, "What was it that caused the shovel to turn over?" replied:

"I guess the shovel was out of order.

"Well, what was it that caused it? I guess it was out of order. I don't know positively one way or the other." (Page 58.)

Mr. Leland says that he saw the shovel lying in the ditch.

"I saw something that convinced me how it turned over. I did not see the accident."

He says:

"Well, it seems that the steam shovel was going down this grade of the main line, you might say, stern foremost; boiler was in front; and the trucks left the track; the front end of the car left the track; and this must have jarred a good deal and caused the casting to break that was holding the boom and the boom swung at right angles to the track and naturally the whole thing went right into the ditch; the piece that I was referring to, that, I thought, caused the accident, was this casting and it showed an old break, probably, certainly over half the value of the casting. I could tell it was an old break by the rust and grease running down into it."

He says that he told Rosemond to put the shovel back on the track, and he did so. He further says that he discovered the broken casting before it was taken up the day of the accident; that he could not tell how or where it was broken; "it looked like an old break; * * * it was unquestionably a secondhand shovel." This witness does not claim to have called the attention of Mr. Rosemond or any one else to the condition of the casting. Mr. Stevenson, who was in charge of the shovel at the time of the derailment, says:

"There was a pin that went through the fore truck into the casting to hold the boom in position; this casting gave way; but after the accident we ex-

amined and found that it was an old break; that it was not apparent before the accident, as the casting was covered with grease and stuff of that kind, etc.; if that casting had held, the boom would not have swung. I showed it to Mr. Leland and Mr. Rosemond." (Pages 72, 73.)

On cross-examination he answers the question:

"Then, as I understand it, the shovel turned over because one of the trucks was derailed and the boom swung over? That is the cause of it turning over.

"And if it had not been derailed, it would not have turned over? I did not say that; the boom might have swung without its being derailed; that casting might have given way."

This is substantially the testimony on behalf of plaintiff respecting the condition of the casting. Defendant introduced Mr. Rosemond, who raised the shovel after the derailment. He says that "it was old-style shovel." He says that he "never saw any broken casting"; that "some week or so afterwards he heard something said about a broken casting." There is evidence tending to show that the shovel had been used some four or five months before plaintiff purchased it; that it was in good condition when shipped from Lakeland, Fla.; that it was tested and found to be in good working order. Mr. Simons, secretary and treasurer of plaintiff, wrote defendant on May 9, 1906, the day of its arrival at Ft. Lawn, that the shovel was "not in the condition in which it was delivered to you at Lakeland, Fla., and, from an inspection of the same, we can see that it is not in proper working order." On May 18, 1906, Mr. Kenly, freight claim agent of defendant, acknowledged receipt of this letter, saying:

"If you will kindly file claim with this company supporting same, with the original B/L paid freight bill and claim bill, I will take pleasure in investigating the matter and will do my best to see that settlement is effected at an early date."

Although the shovel was delivered May 12, 1906, and the second derailment was on the same day, it does not appear that any answer was sent to this letter, nor does it appear that any notice was given defendant, or demand made, for the injury sustained by the second derailment until the complaint was filed herein. It does appear that, notwithstanding the statement in the letter of May 9, 1906, no inspection of the machine was in fact made by plaintiff. This action was instituted June 25, 1907. Assuming that the evidence, in regard to the condition of the shovel when delivered to defendant at Lakeland, Fla., has the same probative value as that regarding its condition when, after the repairs were made at Savannah, it was delivered to the Seaboard Air Line Railway, the case comes to this: A secondhand shovel is delivered to plaintiff at Ft. Lawn, S. C., and by its employés taken over a railroad track completed for a temporary purpose two weeks before, and while being carried over this track, as described by the witness, the trucks under the car, upon which the shovel was placed, leaves the track, causing a jar, which breaks, or causes the breaking of a pin, or casting, holding the boom in place, the boom swings around at right angles with the shovel and causes it to turn over, etc. To sustain plaintiff's contention, we must accept the statement of witnesses, made six years after the derailment, as to the appearance of the pin, or casting, and make their opinion the

basis for the conclusion, not only that it was an "old break," but that it occurred at Savannah and was overlooked by the mechanics, who swear that the injuries sustained at Savannah were thoroughly repaired; that, when necessary, new castings were supplied; that the shovel was tested and found to be as good as new. That the jar, resulting from the trucks leaving the track, was the immediate cause of the pin giving way, releasing the boom, is unquestionably true; but plaintiff insists that the jar would not have produced this result but for the fact that the pin was broken at Savannah and overlooked by those who repaired the shovel. To sustain this conclusion, it is necessary to find every controverted question of fact and every opinion of witnesses, together with every inference to be drawn therefrom as contended by plaintiff. In view of the fact that the burden of proof was upon plaintiff that its employés alone had knowledge of the circumstances, manner of, and condition under which the derailment occurred, and the further fact that although defendant's claim agent on May 18, 1906, six days after the derailment, called for a statement of plaintiff's claim for damages because the shovel was not in the same condition when it reached Ft. Lawn, S. C., as when delivered to it at Lakeland; that no claim was filed; no response made to the request; that the claim made that the derailment was caused by a break in the pin or casting is dependent upon the opinion of interested witnesses expressed six years after the event; that the testimony of plaintiff's witnesses is denied by a witness with equal opportunity for knowing the conditions under which the derailment occurred—I am brought to the conclusion that the evidence fails to sustain the finding of the master in that respect. I am of the opinion that the trucks under the steam shovel left the track of plaintiff's road because of its physical condition and not because the trucks were "out of alignment." It is clear that the breaking of the pin, or casting, holding the boom in position was caused by the jar occasioned by the trucks leaving the track. Mr. Leland says:

"The trucks left the track, and this must have jarred a good deal and caused the casting to break that was holding the boom."

Whether it would have broken without such jar is conjectural; if the testimony of Mr. Leland and Mr. Stevenson be accepted as true, the break was caused by the derailment at Savannah is also conjectural. While it is a legitimate process of reasoning to base an inference upon a fact proven, it is not safe, in the quest for truth, to base an inference upon an inference. The master says that "there is no evidence when this break occurred." This is not strictly accurate. Mr. Leland, plaintiff's witness, says that the jar caused by the truck leaving the track "caused the casting to break." He further says that the old break was "probably certainly half the value of the casting." The casting had held the boom in position during the transportation over the railroad from Lakeland to Savannah and from there to Ft. Lawn, thus showing that it was efficient for that purpose until the jar, caused by the trucks leaving the plaintiff's track, caused it to break. Plaintiff's contention is based upon two inferences, both of which must be sustained before the defendant can

be fixed with liability: First. That the break occurred at Savannah and was overlooked by defendant's workmen. Second. If it had not been broken at Savannah, the jar caused by the trucks leaving the track would not have broken or caused it to give way. The evidence leaves the question in the domain of uncertainty and doubt; it does not place the conclusion upon that plane of legal proof which enables the courts to fix liability. The defendant's exceptions from 8 to 12, inclusive, are sustained.

This finding eliminates the damages alleged to have been sustained by plaintiff by reason of injury to the shovel or delays caused after March 21, 1906, the day upon which the master finds it should have been delivered, thus confining the claim for damage alleged to have been sustained from March 21 to May 12, 1906. The master says that no damage was sustained by reason of any depreciation in the value of the shovel. He says:

[3] "The notice given to the railroad company before shipment was two-fold: (1) That the plaintiff was liable to $50 damages a day for failure to complete the contract. (2) That the shovel was to be used for a special purpose. This penalty of $50 a day plaintiff did not suffer; and, had the article of shipment been merely delayed and plaintiff's loss fixed at $50 per day, the amount of special damage would be limited to these penalties; and, these not having been imposed, the railroad would not be liable to pay any damages on this account. * * * The notice stated further that the shovel was to be used on a contract which plaintiff had at Great Falls or Ft. Lawn, and that, the carrier being notified of this fact, the measure of damages for the delay and injury in carriage is the expense and detriment to the special business with reference to which the carriage was undertaken fairly attributable to the delay."

By exceptions to these findings we are brought to the inquiry: For what damage is defendant liable on account of the delay to deliver the shovel within a reasonable time, to wit, between March 21 and May 12, 1906? While there is conflicting evidence in that respect, I concur with the finding that plaintiff was prepared to use the shovel on March 21, 1906. The extent to which, and value of its use, at that time is much more uncertain and doubtful. The master says that "there was no testimony given us to any items of damage." He proceeds to ascertain the capacity of the shovel, by a system of estimation, how much dirt it would, when operated, remove a month, and this he makes the basis of his calculation of damage. Both parties except to the measure of damages applied by the master and his estimate respecting the capacity of the shovel. Plaintiff presents its contention by a number of exceptions. It is contended that by applying correct measure of damages the master should have awarded $29,-616.98. This result is reached by showing that the plaintiff, from the time it began work until it surrendered the contract to the power company, expended $78,773.73 and received $49,434.60, leaving a loss of $29,339.13. This contention is based upon the theory that not only was the defendant liable for the delay but for failure of the shovel to work efficiently during the entire time that it was in use by plaintiff, and this was the cause of its failure to carry out the contract. Having found that defendant was not liable for the injury sustained by the shovel, after the delivery to plaintiff, this exception cannot be sus-

tained. The other exceptions relate to the estimate made by the master in regard to the monthly capacity of the shovel. Assuming that the plaintiff was prepared to use the shovel on the work covered by the contract on March 21, 1906, several questions arise: First. Upon the finding of the master, in regard to the notice given defendant, what damages were within the contemplation of the parties, in the event of a breach? Second. Assuming that damages, other than the penalty fixed for failure on the part of plaintiff to complete the work on the day fixed in the contract, were, by the notice, brought within the contemplation of the parties, what is the measure of such damages and how are they to be ascertained? Third. Assuming that the defendant became liable for other damages than the penalty, does the evidence sustain the finding of the master as to their character and amount? Defendant, by its exceptions 3, 4, 5, 6, and 7, presents the first and second and, by its other exception, the third question.

The principle upon which a carrier is held liable for special damages resulting from delay in the carriage and delivery of goods is well settled. The difficulty experienced by the courts is found in the application of these principles. The plaintiff cites the case of Towles & Arnett v. A. C. L. Ry. Co., 83 S. C. 501, 65 S. E. 638, in which it is said:

"The rule is well settled that notice, at the time of the contract, of circumstances from which special damages may reasonably be expected to result will make the defendant liable for such damages on the ground that they are within the contemplation of the parties and therefore regarded as forming a part of the contract."

This is a clear and accurate statement of the doctrine announced in Hadley v. Baxendale, 9 Exch. 341 (cited by Mr. Justice Gary), and recognized to be the leading case upon the question in England and America. The reason assigned why the defendant, who breaches a contract for the delivery of an article, becomes liable for special damages is that, having notice that such damages will be sustained by the failure to perform on his part, he must be regarded as assuming such liability, or, as the courts say, contemplating such damages as resulting from a failure on his part. It is said:

"Where, from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may reasonably be presumed that they were within the intent and mutual understanding of both parties at the time it was entered into." Howard v. Stillwell & B. Mfg. Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147.

Assuming, therefore, that by accepting the proposition to receive and carry the shovel, within a reasonable time, with notice of the terms of the contract between the plaintiff and the Southern Power Company, as found by the master, both parties contemplated that a failure to perform on the part of defendant, resulting in a failure on the part of plaintiff to receive the stipulated premium for an anticipated completion of the contract or, the penalty for a failure to complete it on the day fixed, defendant agreed to be responsible for such result, what was the extent of its assumed liability? It will be interesting to see what construction plaintiff put on the contract in this respect. On April 2, 1906, Mr. Simons, secretary and treasurer of

plaintiff, who made the contract, wrote Mr. Renneker, agent of defendant, complaining of the delay, saying:

"We are under contract with the Southern Power Company to complete certain work at Ft. Lawn by the 1st of November. This contract provides that they are to pay us $50 for every day that we 'finish before that time, and we are to pay them $50 for every day that we take over that, and we have been ready for that shovel for some time, * * * and it has not arrived yet, and we have sustained actual damage of $50 a day since the 21st of March, 1906, which, to this date, April 2d, amounts to $600. This damage continues to be sustained each day we are without the use of the shovel. Of course we shall hold you responsible for all damages sustained by us through your unreasonable delay and beg herewith to file with you our claim for $600 damages to the 2d of April, 1906."

On April 6th plaintiff again wrote defendant, saying:

"We beg to call your attention to our letter of April 2d, informing you that we are under the contract to finish this work by November 1, 1906, and every day after the 1st of November we will have to pay the Southern Power Company $50 and every day that we get through before that time they are to pay us $50, and to repeat what we said to you in that letter, we shall hold you for the loss of $50 per day from the time that we were ready for that shovel (March 21st) until it is delivered to us in Ft. Lawn, S. C."

On April 25, 1906, plaintiff again writes and complains of the delay:

"As we wrote you some time back, this unnecessary and uncalled for delay on the part of your people is causing us great loss and expense, as we are under a contract, of which we already notified you, which would cause us to lose $50 a day, if not more, by this delay of this shovel, and we shall certainly hold your people responsible for it."

On April 27, 1906, plaintiff wrote Mr. H. Walters, who holds some high position in the defendant's New York office, stating that they had shipped the shovel over the road, and saying:

"We told them that we had a contract with the Southern Power Company, under which we would have to pay a demurrage of $50 a day for every day that we were behind after November 1, 1906, and would receive $50 a day if we finished before November 1, 1906. * * * We desire to repeat to you the notice that we have given your representatives here that we will hold your road responsible for the damage of $50 per day from that time until the shovel is delivered to us and also for any loss of time of our superintendent and employés, and all and whatever damages we shall sustain on account of your carelessness in this matter. We desire to notify you also that, under our contract with the Southern Power Company, they have a right to cancel this contract if, in their judgment, we are not carrying it on properly. Should anything of this kind happen, we shall have a very heavy claim against your road in the matter."

These repeated declarations on the part of plaintiff show clearly what damages were in the contemplation of Mr. Simons, its secretary and treasurer, for which defendant would be liable in the event of a breach. The contract was, by the mutual agreement of plaintiff and the Southern Power Company, taken over and the work undertaken by the latter prior to November 1, 1906. The master says:

"That an examination of the contract * * * shows clearly that there were other causes at work which caused delay and loss beside the delays and damage to the shovel."

It is manifest, therefore, that plaintiff, having surrendered the contract prior to the day fixed for its completion, cannot claim any dam-

ages from defendant on account of loss of the premiums which it never earned, nor for penalties which it never paid. The master says:

"The notice, however, stated further that the shovel was to be used on a contract which plaintiff had at Great Falls or Ft. Lawn; and, the carrier being notified of this fact, the measure of damages for delay and injury in carriage is the expense and detriment to the special business with reference to which the carriage was undertaken fairly attributable to the delay."

[4] This conclusion fixes the defendant with liability for two different and distinct elements of damage. The parties having, by their contract, fixed the measure of compensation to be received for completion before the time, and penalty for delay after the time, and this being known to defendant, it is a fair and reasonable inference that the parties had these terms of the contract and results of its breach in contemplation when they entered into the contract of carriage. To hold that, in addition to this liability, assumed by the defendant, it further contemplated and assumed liability for the "expense and detriment to the special business, etc.," is to find in the minds of the parties and read into the contract a contemplated liability which, as a matter of fact, I cannot find was there and cannot therefore be read into the contract. The courts have carefully defined the principle upon which the liability for special damages for breach of contracts is founded. In Tillinghast, etc., v. Cotton Mills, 143 N. C. 272, 55 S. E. 622, it is said by Hoke, J.:

"If the plaintiff seeks to recover different and additional damages arising by reason of special circumstances, he is required to show that defendant had knowledge of these circumstances, and of a kind from which it could be fairly and reasonably inferred that the parties contemplated that they should be considered as affecting the question of damages."

See Ashe v. De Rossett, 50 N. C. 299, 72 Am. Dec. 552; Davidson Development Co. v. So. Ry., 147 N. C. 503, 61 S. E. 381; Harper Furniture Co. v. So. Ex. Co., 148 N. C. 87, 62 S. E. 145, 30 L. R. A. (N. S.) 483, 128 Am. St. Rep. 588; Wilkinson v. Dunbar, 149 N. C. 20, 62 S. E. 748; Towles v. A. C. L., 83 S. C. 501, 65 S. E. 638.

Mr. Justice Gary in Moore v. A. C. L. Ry. Co., 85 S. C. 19, 67 S. E. 11, quoting from the opinion in Towles' Case, supra, says:

"Special damages cannot be recovered in an action ex contractu unless the defendant had notice of the circumstances, from which they might reasonably be expected to result, at the time the parties entered into the contract, as the effect of allowing such damages would be to add to the terms of the contract another element of damages not contemplated by the parties."

Baron Alderson in Hadley v. Baxendale, supra, says:

"If the special circumstances under which the contract was actually made were communicated by the plaintiffs to the defendants, and thus known to both parties, the damages resulting from the breach of such contract, which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of the contract under these special circumstances so known and communicated."

I am of the opinion that the defendant's liability is restricted to the gain or loss of $50 a day as fixed by the contract. In addition to the difficulty which is experienced in holding that any other damage was in contemplation of the parties, I am impressed with the uncertainty

of the basis upon which the master's calculation is made. An examination of a few of the decided cases will serve to illustrate the difficulty found in applying the rule and the care with which the courts have guarded it to prevent injustice.

In Hadley v. Baxendale, supra, the plaintiffs, owners of a planing mill, sent a broken iron shaft to the defendant, a common carrier, to be carried to a manufacturer to serve as a model or pattern for a new one. Defendant was notified that the mill was stopped and that the shaft should be delivered immediately. The delivery was delayed an unreasonable length of time, during which the plaintiff was unable to operate the mill, incurring a loss of profits. It was held that defendant was not liable for such loss because:

"They were not considered as such a consequence of the breach of contract as could have been fairly and reasonably contemplated by both the parties when they made the contract."

In Howard v. Stillwell, etc., Co., 139 U. S. 199, 11 Sup. Ct. 500, 35 L. Ed. 147, it appeared that defendant in error contracted to reconstruct a flour mill for plaintiff in error; the work to be completed by a fixed day. Damages for breach of the contract were claimed, etc. The Supreme Court held that there were no "special circumstances attending the transaction from which an understanding between the parties could be inferred that the plaintiff was to make good any loss of profits incurred by a delay in furnishing and putting up such machinery." Mr. Justice Lamar cites a number of cases sustaining the conclusion reached by the court. I have examined the cases cited by counsel for both parties decided by the Supreme Court of South Carolina and find that they adhere closely to the rule laid down in Hadley v. Baxendale, supra. The opinion in Hays v. Telegraph Co., 70 S. C. 16, 48 S. E. 608, 67 L. R. A. 481, 106 Am. St. Rep. 731, 3 Ann. Cas. 424, reviews the cases.

If, however, it be conceded that defendant is liable "for expense and detriment to plaintiff's special business," much difficulty is found by the master in ascertaining what loss was sustained by reason of the delay. In the performance of the contract, the use of the shovel was dependent upon a number of other agencies, some of which were not efficient. There is very convincing testimony from disinterested witnesses tending to show, by reason of other conditions and causes entirely disconnected from the delay in receiving the shovel, plaintiff could not have completed the contract within the time fixed, or at all, without loss. Plaintiff's president and officers think otherwise. The courts compel payment of such damages for breach of contract as will compensate the injured party. There must, however, be such evidence both as to the character and extent of the injury as will enable the jury, or other trier of the fact, to find with a reasonable degree of certainty the amount of damages sustained. The recovery cannot be sustained upon speculation, guesses, or estimates of witnesses upon which the jury must speculate. Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 49 C. C. A. 244.

In Swift v. Johnson, 138 Fed. 867, 873, 71 C. C. A. 619, 625 (1 L. R. A. [N. S.] 1161), Judge Van Devanter says:

"The law, in confining the compensation to the pecuniary loss, does not run along the lines of the imaginary and the possible but rather along the lines of the actual and the probable, and therefore the reasonable expectation must be made to appear by the evidence. Conjecture, speculation, and fancy cannot supply the absence of evidence or avoid the effect of the evidence which is presented."

Mr. Justice Selden, in Griffin v. Colver, 16 N. Y. 489, 69 Am. Dec. 719, says:

"Damages (recoverable for breach of contract) must be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract (that is, must be such as might naturally be expected to follow its violation), and they must be certain, both in their nature and in respect to the cause from which they proceed. * * * These two conditions are entirely separate and independent and to blend them tends to confusion; thus the damages claimed may be the ordinary and natural, and even necessary, result of the breach, and yet, if in their nature uncertain, they must be rejected."

In cases where delivery of machinery is delayed by the manufacturer, by the repairer, or by the carrier, the courts have experienced much difficulty in laying down a satisfactory and fair rule for the admeasurement of damages. Anticipated profits are usually too uncertain, subject to too many contingencies, too elusive to constitute a safe guide. Mr. Justice Miller, speaking of the variety of cases, discussing the doctrine of causation, says:

"If we could deduce from them the best possible expression of the rule, it would remain, after all, to decide each case largely upon the special facts belonging to it, and often upon the very nicest discriminations." Mutual Ins. Co. v. Tweed, 7 Wall. 44, 19 L. Ed. 65.

It is manifest that anticipated profits could not be a safe rule to adopt in this case, under any possible view of the evidence. The court has, in some cases, given to the injured party the rental value of the plant during the suspended operation caused by the defendant's delay. New York Mining Co. v. Fraser, 130 U. S. 611, 9 Sup. Ct. 665, 32 L. Ed. 1031. An interesting discussion of this line of thought is found in Brown v. Railroad, 154 N. C. 300, 70 S. E. 625, in which the rental value of the machine was adopted. In Cotton Mills v. Railroad, 119 N. C. 693, 25 S. E. 854, 56 Am. St. Rep. 682, the interest on the capital invested, wages paid workmen, etc., were held to be the measure of recovery for delay in delivering machinery for a cotton mill. Courts manifest a disinclination to make anticipated profits the basis of recovery. The master, in his finding, adopted an estimate based upon evidence of the capacity of the shovel before and after the delivery, and from this estimate fixed the amount of the loss. There was much conflicting evidence as to the condition under which the shovel was operated after July 1, 1906, the date adopted by the master as the basis for finding its capacity. However, I sustain the exception to the master's finding of law, because I am of the opinion that such special damages were not within the contemplation of the parties when they entered into the contract of carriage. If plaintiff had shown that it had sustained loss, the amount of which was measured by the terms of its contract with the Southern Power Company, and that the

breach of the contract by defendant was the proximate cause of such loss, it would have been entitled to recover the amount of such loss. As no damage was sustained by reason of the injury sustained at Savannah, and as upon the report, as modified, the defendant is not liable for the injury sustained by reason of the second derailment, the plaintiff will recover nominal damages. I have given to the report, the evidence, and the very full and able argument of counsel, careful examination and consideration. The evidence presents a very unusual and, in many respects, novel case. I have endeavored to put the record in a condition which, upon a review of the judgment, a final disposition of the case may be made. It is unfortunate for all parties that testimony was taken so long after the occurrence of the events.

Let a judgment be drawn in accordance with this opinion.