THE PENSACOLA. ATLANTIC, GULF & PACIFIC CO. et al. v. SEABOARD TRANSPORTATION & SHIPPING CO. SEABOARD TRANSPORTATION & SHIPPING CO. v. ATLANTIC, GULF & PACIFIC CO.

(Circuit Court of Appeals, Fifth Circuit. March 18, 1920.)

No. 3442,

1. SHIPPING ☞40—CONTRACT CONSTRUED AS TO TIME FOR COMMENCEMENT OF SERVICE.

A provision of a time charter covering a tug, that time was to commence immediately after midnight March 16th, *held*, in view of the correspondence preceding the making of the charter and the contemporary construction given it by the parties, to fix not only the time from which the tug, if ready, was to be paid for, but also the time when the owners were obligated to have it ready to commence the stipulated service.

2. SHIPPING ☞39—CHARTER CONSTRUED AGAINST PARTY PREPARING.

The language of a charter for a tug was to be construed most strongly against the owner, where its manager prepared the charter party on a printed form in its possession.

3. SHIPPING ☞49(3)—CHARTERER OF TUG NOT LIABLE FOR HIRE FOR PART OF DAY BEFORE SERVICE WAS COMMENCED.

A time charter for a tug, requiring the charterers to pay $600 a day "or fraction thereof," commencing from the day of delivery, and at the same rate "for any part of a day," did not obligate the charterer to pay for that part of the day of delivery elapsing before the tug was ready to commence the service, but only to pay for parts of days used by the tug in rendering the service.

4. SHIPPING ☞49(3)—CHARTERER NOT LIABLE FOR PART OF DAY FOLLOWING REDELIVERY AFTER CLOSE OF CUSTOM HOUSE.

Under a charter for a tug, providing that the hire was to continue until delivery of the tug to the owners at her berth at the Galveston docks, where the tug was tied up at its berth after the custom house had closed for the day, the charterer was not liable for the hire of the tug for a part of the following day, though under a government regulation it could not enter upon another charter until entered at the custom house.

5. SHIPPING ☞58(2)—CHARTERER HAD BURDEN OF SHOWING DELAY DUE TO TUG'S DEFECTIVE CONDITION.

A charterer of a tug, sued for the hire thereof, had the burden of showing a delay on the part of the tug in towing its dredge, due to the defective condition of the tug or its equipment, and did not sustain such burden, where the evidence did not convincingly show that the tug's progress was slower in consequence of its boiler steaming badly, or show how much of the delay was due to that cause, and how much to adverse winds and currents.

6. SHIPPING ☞58(3)—DAMAGES FOR DELAY HELD PROPERLY MEASURED.

Where a tug did not report to a charterer for over four days after the time specified in the charter, and it was shown that the reasonable value

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the use or hire of the dredge to be towed at the point to which it was to be towed was $720 a day, the conclusion that the delay resulted in a loss of $2,628.12, the amount claimed, was warranted, though the owner of the tug did not know of the existence or terms of a contract to be performed by the dredge.

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Libel by the Seaboard Transportation & Shipping Company against the Atlantic, Gulf & Pacific Company, claimant of the dredgeboat Pensacola. From a decree for an insufficient amount, the libelant appeals, and the claimant and its surety file a cross-appeal. Modified and affirmed.

Harry T. Smith and Wm. G. Caffey, both of Mobile, Ala., for appellants and cross-appellees.

Wm. B. Lockhart and John W. Lockhart, both of Galveston, Tex., and Palmer Pillans, of Mobile, Ala., for appellees and cross-appellants.

Before WALKER, Circuit Judge, and GRUBB and CALL, District Judges.

WALKER, Circuit Judge. The individuals composing a partnership doing business under the name of Seaboard Transportation & Shipping Company (herein referred to as the Seaboard Company), owners of the steam tug Leopold Adler, filed a libel against the dredgeboat Pensacola, claiming an amount alleged to be due under a time charter party between the Seaboard Company and the Atlantic, Gulf & Pacific Company (herein called the Atlantic Company), for the hire of the tug for a round trip to Mobile, Ala., and return, the libel alleging that 11 days and fractions of days elapsed between the time the tug was delivered on March 20, 1918, to the Atlantic Company and the time it was redelivered to the Seaboard Company. A copy of the charter party, the date of which was March 11, 1918, was made an exhibit to the libel. Among the provisions were the following:

"Tug to be placed at the disposal of the charterers at Galveston, Texas, in such dock or at such wharf or place (where she may always safely lie afloat, at all times of tide), as the charterers may direct, and being, on her delivery, ready for service and tight, staunch, strong and in every way fitted for the service (and with full complement of officers, seamen, engineers, and firemen for a vessel of her tonnage), and to be so maintained during the continuation of this charter party, to be employed in towing dredge Pensacola from a point of sufficient depth of water on the Houston Ship Channel for the tug to safely float, to Mobile, Alabama. * * * That the charterers shall pay for use and hire of the said vessel six hundred dollars ($600.00) per day or fraction thereof, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a day; hire to continue until her delivery, with clean holds to the owners, at Galveston, Texas. Payment of said hire to be made in cash, at the office of the Seaboard Transportation & Shipping Company, Galveston, Texas, upon due delivery of the tug at her berth at the Galveston docks. * * * That the captain shall prosecute his voyage with the utmost dispatch. * * * That time is to commence immediately after midnight March 16, 1918."

The charter party, as drawn by the Seaboard Company, was sent with a letter of the same date which expressed an agreement that $492

per day was to be charged for lay days, comprising the time the tug might actually wait for the dredge to be ready. The Atlantic Company resisted the claim asserted by the libel, and by a cross-libel claimed $2,628.12 as damages occasioned by the tug's delay of 3 days and 15 hours in reporting for service, and $2,175 as damages for delay occasioned by the alleged defective condition of the tug or its equipment. There was a decree in favor of the Seaboard Company for 9 days' time at the charter rate, with interest. The case is in this court on an appeal by the Atlantic Company and on a cross-appeal by the Seaboard Company; the former complaining of the failure of the court to allow the claims asserted in the cross-libel, and the complaint of the latter being that the court did not decree in its favor for eleven days service of the tug.

[1] The tug reported for the service for which it was hired in the afternoon of March 20th. In behalf of the Atlantic Company it is contended that, under an above-quoted provision of the charter party, the service of the tug was due to begin "immediately after midnight March 16, 1918." In behalf of the Seaboard Company it is contended that the charter party did not obligate it to furnish the tug sooner than it was furnished for the service provided for. Each of the parties, by introducing in evidence letters and telegrams which passed between them, treated that correspondence as proper to be considered in determining the meaning of provisions contained in the charter party. A letter of the Seaboard Company, dated March 4th, and addressed to the Atlantic Company, contained the following:

"Tug Leopold Adler—Your Dredge Pensacola.

"The writer confirms conversation with your Mr. Walsh to-day. The above tug is now under charter to the Texas Company, and we anticipate the trip to last all the way from 5 to 10 days, depending whether or not the tug is required to await the unloading of the barge towed down or to return here light. If she returns light, she will be here by Monday at least."

The following is the body of a telegram sent by the Seaboard Company on March 9th:

"This confirms your acceptance tug Leopold Adler at rate six hundred dollars per day effective Friday March. fifteenth when tug subject your instructions this date must be definitely agreed upon otherwise could not hold tug for your information tug now Tampico expects leave soon presumably returning here midweek next must have confirmation to-day."

A letter of the Seaboard Company of the same date confirmed the telegram, and contained the following:

"We anticipate that the tug should reasonably return to Galveston by the middle of the coming week, about the 13th instant. You estimate that your dredge will be ready by Friday, the 15th instant. While we are figuring on other tows and reserve the right to close with them, if we do not receive an answer finally closing the deal from you this afternoon, we are ready to forego any day's intervening between the arrival of our tug here and the date of departure of your dredge by Friday. It is necessary, of course, for us to insist upon a definite date when the tug's time is to begin in view of the reasons above stated. On the other hand, it will pay your principals to stand to lose a day or two of the tug's time in view of the assurance of having the towboat firm in hand."

On March 11th the Atlantic Company, in reply to the Seaboard Company's letter accompanying the charter party signed by it, telegraphed:

"We accept your offer for charter of the Leopold Adler at $600 per day, and lay days, if any before starting, at $490, tug to be alongside dredge at Harrisburg Saturday morning the 16th, subject to our orders."

The following is the body of a letter of the Seaboard Company, dated March 14th:

"This acknowledges receipt of your letter of the 12th instant with duplicate signed charter party, all of which is now in order. There appears to be no hitch in regard to the tug reporting in time at Harrisburg, as she is due to arrive here Friday night, at which time immediate steps will be taken to turn her over to you."

A letter of the Seaboard Company, dated March 18th, and written after it learned of the delay by bad weather of the tug's return to Galveston, and had telephoned the Atlantic Company·on the subject, contained the following:

"It is with sincere disappointment that the weather has interfered with our plans so seriously. We are, of course, even more so disappointed in view of the fact that we had hoped to move your dredge on schedule time. Certainly the government cannot hold you responsible for circumstances as they have presented themselves, as neither you nor we have control of the weather situation."

As above indicated, for the Seaboard Company it is contended that the provision of the charter party that "time is to commence immediately after midnight March 16, 1918," had reference only to the time from which payment was to be made for the tug upon its reporting or being ready for service, and had no reference to a time at which the tug was to be at the service of the charterer. This contention is not reconcilable with the construction given by one of the parties to the charter party at the time it was made and acquiesced in by the other party. The Atlantic Company's telegram of March 11th shows that its acceptance of the charter party was with the understanding that the tug was to be alongside the dredge at the time stated in the quoted provision "subject to our orders." The Seaboard Company's letter of March 14th, acknowledging the receipt of the duplicate signed charter party, shows that it understood that the time for the tug to report was fixed. Its letter of March 9th shows that, when it meant "the tug's time," it used those words; whereas, the word "time," as used in the last-quoted provision of the charter party, is accompanied by no qualifying language having the effect of showing that only "the tug's time," and not the time it was to be subject to the charterer's orders, was meant.

[2] The language is to be construed most strongly against the party using it. The charter party was prepared by the manager of the Seaboard Company, a printed form in its possession being used. While the Seaboard Company's letter of March 9th showed that it insisted on a definite date when the tug's time was to begin, it also showed that it proposed to assure the Atlantic Company that the latter would have "the towboat firm in hand." The just quoted language well may be

given the same meaning that would have been expressed by an assurance that the tug would be subject to the Atlantic Company's orders at the definite date proposed to be fixed. That letter also shows that the Seaboard Company expected the tug to be available for the proposed service long enough prior to March 16th for it to be made ready for the proposed trip before the time stated. Nothing in the correspondence indicates that the Seaboard Company contemplated that anything was likely to happen to prevent the tug being ready for the proposed service at the definite date proposed to be fixed. The Seaboard Company's letter of March 18th indicates that it understood that there was a "schedule time" for the movement of the dredge to be commenced, and that time was of importance to the owner of the dredge because of an engagement for the use of it at the place to which it was to be moved. The conclusion is that the charter party, considering its language in the light of expressions used in the negotiations which preceded the making of it, and of the contemporary construction given to it by the parties, not only fixed the time from which the tug, if ready to render the stipulated service, was to be paid for, either at the lay day or the service rate, but obligated its owners to have it ready to commence the stipulated service "immediately after midnight March 16, 1918."

[3] The tug was not ready to commence the stipulated service at the time stated in the charter party, nor on the morning of March 16th, the time at which it was ordered to report for service. It was not alongside the dredge at the meeting place agreed on by the parties until 3:30 or 3:35 in the afternoon of March 20th. During part of that day the tug was being coaled and otherwise made ready for the trip. We are not of opinion that the provision of the charter party "that the charterers shall pay for use and hire of said vessel $600 per day or fraction thereof, commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a day," had the effect of obligating the charterer to pay for that part of the day of the delivery which elapsed before the tug was ready to commence the service in pursuance of the charterer's orders. We think the provision for paying for parts of days means parts of days used by the tug in rendering the service, and not that part of the day on which the service was commenced, during which the tug was not available for use by the charterer. It is fairly disclosed that it was not intended that pay for the tug was to commence before it was available for the stipulated service.

[4] The hire of the tug was "to continue until her delivery, with clean holds, to the owners, at Galveston, Texas, * * * payment of the said hire to be made in cash, * * * upon due delivery of the tug at her berth at the Galveston docks." The tug got back to Galveston and tied up at a dock, which was its berth, at 5:30 p. m. on March 29th, and immediately proceeded to take on coal and otherwise prepare for other service. This was after the custom house there had closed for the day. Under a government regulation in force at that time the tug had to be entered at the custom house before it was permitted to enter upon another charter. Based upon the circumstance

that this could not be done until the following day, it is contended in behalf of the Seaboard Company that the hire of the tug continued until it was entered at the custom house during the forenoon of March 30th. Nothing in the charter party indicates an intention that the hire of the tug was to continue after it was delivered at its berth at Galveston and actually was in use by its owners for their own purposes exclusively.

[5] The time elapsing between the tug reporting for service and the return of it to its berth at Galveston was 9 days and a fraction of a day. The charterer is chargeable for that time at the stipulated rate, unless, as claimed by the charterer, the trip to Mobile, by reason of faults chargeable against the owner, took substantially more time than it ought to have taken. The evidence showed that that trip took longer than it should have taken if it had been made under different conditions. It is clear from the evidence that the tug's progress was interfered with by adverse currents and winds. There was evidence showing that the tug's boiler steamed badly during a considerable part of the time the dredge was in tow. It did not convincingly show that the tug's progress was made slower in consequence of its boiler steaming badly, and it furnished no data for determining how much of the delay in reaching Mobile was attributable to adverse winds and currents, and how much, if any, of it was due to bad steaming of the boiler. The burden was on the Atlantic Company to prove its allegations as to delay occasioned by the defective condition of the tug or its equipment. We do not think that the evidence was such as to justify a finding that those allegations were sustained.

[6] But for the tug's failure to be on hand and ready pursuant to the contract, the trip to Mobile could have commenced in the morning of March 16th, instead of in the afternoon of March 20th. During that interval the dredge was manned and equipped, ready for the trip and for the service at Mobile in which it was to engage. It was under contract for work at Mobile at a stipulated compensation. It was not shown that the Seaboard Company was informed of the existence of that contract, or of the terms of it, though evidently it understood that the dredge was to be carried to Mobile for the purpose of promptly starting work there. It was shown that the reasonable value of the use or hire of the dredge at Mobile was $720 per day. To the tug's delay in being ready to commence the towage according to contract is to be attributed the delayed opportunity to hire or use the dredge at Mobile. The delay so caused was from the morning of March 16th, the time the tug was ordered to report for service, to 3:30 o'clock in the afternoon of March 20th, when the tug reported for service, making more than four days. The evidence supports the conclusion that the delay so caused in reaching Mobile resulted in loss to the owner of the dredge of the amount, $2,628.12, claimed in the cross-libel as damages occasioned by the tug's delay in reporting for service.

The conclusion is that the award to the Seaboard Company should be for 9 days and a fraction of a day at the charter rate of $600 per day or fraction thereof, less $2,628.12, allowed as a set-off to the Atlantic Company, with interest at 6 per cent. per annum on the balance

from March 29, 1918, to the date of the decree appealed from. It is ordered that that decree be modified as above indicated, and, as so modified, it is affirmed; each party to be taxed with half the costs. Modified and affirmed.