## THE HELEN BARNET GRING.

### No. 1707.

District Court, D. Maryland.

Jan. 6, 1931.

George Forbes and Henry L. Wortche, both of Baltimore, Md., for libelant.

Niles, Barton, Morrow & Yost, of Baltimore, Md., for respondent.

SOPER, District Judge.

This libel against the schooner Helen Barnet Gring is based upon a claim for cargo damage. The schooner is a vessel 202 feet in length by 40 feet beam, and was engaged to carry some 1,800 tons of fertilizer from Baltimore to Searsport, Me. The contract was covered by a general charter party for sailing vessels, under which the Gring was tendered to the Davison Chemical Company, the libelant, in the early part of February, 1929. She docked on February 12th at Baltimore, was loaded during the 13th, 14th, and 15th, issued a bill of lading for the cargo on the 15th, sailed on the 17th, and arrived at her destination on or about March 9th. When she reached Searsport it was discovered that there was damage to her cargo, which has not been described in detail in the evidence, but is estimated to have affected from 5 to 10 per cent. of the goods. The top of the cargo was dry, but in the lower hold the bags of fertilizer were wet to a height of four or five feet, which reached the fourth tier of bags. There was also a comparatively small damage affecting only 100 or 150 bags which were stored on the starboard side of the ship in the 'tween-decks.

There are two general theories advanced by the respective parties as to the causes of the damage. The libelant claims that the ship was leaky and unseaworthy, and that her owners failed to exercise that degree of due diligence which, under the charter party, they were required to use in order to relieve themselves of liability for damages arising from a defective ship. The libelant says that by reason of certain defective seams and leaks in the hull of the vessel she took water during her voyage, with the consequent damage to her cargo. On the other hand, the ship owner and claimant of the vessel contends that the vessel was seaworthy in every particular, but that on this particular voyage she met with particularly heavy weather, high winds, and rough seas, whereby she took only that amount of water which every wooden

vessel must take at sea, and that in the rolling and straining of the vessel in the heavy seas, caused by high winds, she blew her bilges; that is to say, the water in her bilges was forced up, due to the rolling of the ship, through the crevices in the ceiling of the ship, and came thence in contact with the cargo.

The court is convinced that, whatever may be said in regard to the tendency of a ship of this sort to blow her bilges and injure her cargo in heavy weather, the preponderance of the evidence shows that the ship was not seaworthy when she sailed. A number of circumstances contribute to this conclusion. The vessel had laid at Newport News or Norfolk idle for some six weeks before the voyage in question. She was surveyed by Surveyor Leach on February 8, 1929. His testimony shows that to some extent, certainly so far as the interior of the vessel is concerned, he accepted the statements of the mate or engineer as to her condition, but he personally examined the hull of the ship, acting for the Boston Insurance Company. He wired that company on February 8th after his survey that the Gring was satisfactory, but her seams must be searched between the light and load lines before loading, and that her owners should attend to this matter. His more formal survey report, of the same date, shows that the condition of the vessel was good in other respects, but under the heading of "Caulking" states that the seams and butts between the light load and the load line in places showed that the cement was broken and the oakum soft; that this condition was not serious, but was one which the owners should attend to before loading the next cargo. He reported that the deck and top side seams were in good condition. Notwithstanding this warning from the surveyor, which was communicated verbally to the captain of the ship, no searching of the seams was made and no caulking was done. When the ship got to Searsport and the damage to the cargo was discovered, she was visited by a representative of the shipper and also by a representative of the consignee. Their testimony shows that the hold of the vessel was wet, that it was stained with the cargo to a height of four or five feet, and also that there was some damage to the cargo stowed in the 'tween-decks on the starboard side. Their testimony also shows that the captain complained that he had had no time to caulk the vessel before she sailed, and that he said he had not been able to secure a certificate of seaworthiness. He also stated that there was a defective steam pipe beneath the main deck underneath which the damaged cargo in the 'tween-decks was found.

A further examination of the ship was made as to her seams by the surveyor Stein on April 3d, after the vessel had returned to Baltimore with a portion of the damaged goods. He found that the seams between the light load line and the deck were in bad shape, and that they required caulking between the joints of some twenty-one planks in that part of the hull; he found the wood in the timbers of the hold were water-logged; that the steam pipe referred to was rusty and perforated with pinholes, and he offered the opinion that the vessel must have had, during her voyage to Searsport, as much as a foot of water over the ceiling of the hold.

The testimony on the other side as to this question of seaworthiness should also be referred to. There was a survey by the Surveyor Schilpp on February 14th, before the vessel sailed. This survey seems to the court to have been quite casual and superficial. It was undertaken under a general contract between the surveyor and his insurance company and without particular reference to any repairs that, if necessary, should be made to the ship, or with reference to any particular contract or proposed contract of freight movement. At that time the vessel was partly loaded so that a portion of her hull was not exposed for examination, and she was lying on the starboard side close to the pier upon which the surveyor stood to examine the hull. He could see only the starboard side of the vessel and that imperfectly by reason of the conditions. He made no examination of the port side. His testimony is supported by a report which he made at that time to the insurance company that the vessel's condition was good, and that she was safe for the carrying of her cargo.

This testimony does not convince the court that the ship was in good condition, particularly as the surveyor Leach, employed, it would seem, by the same insurance company, had found the defects above described when the vessel was lying in the water at Norfolk, and he had access to her hull. There is also a survey made at Searsport after the vessel arrived with her damaged cargo by Concord and Gilkie. There is the unusual circumstance that two surveys are offered to the court, one by the libelant and one by the owner of the ship, signed by the same surveyors and contradictory in terms. One of these surveys is undated, but refers to the fact that the surveyors went on board the ship on March 16th and March 19th to survey the

damage to the cargo. The report shows that the cargo was badly damaged from water which, according to the report, apparently came down through the thick work at the beam ends, owing to the heavy rolling and straining of the schooner. The report states that the schooner seems staunch, sound, and in every way fit to make the voyage, and in the opinion of the subscribers the damage to the cargo was due to the unusual violent gales encountered in the passage.

On the other hand, there is the report offered by the libelant under date of March 21, 1929, referring to the same two visits of March 16th and March 19th. This report shows the quantity of damaged goods then noticed and concludes with the statement as follows: "As the survey was intended only to cover the cargo damage, we did not inspect the hull of the vessel or examine the caulking." This report is supported by an affidavit of the surveyors before a notary.

It seems to the court that the contrast between these two reports is so striking, and the statement in the second report mentioned that no examination of the hull was made is so definite, that it is impossible for the court to conclude that there was no damage to the hull or defect in the caulking observable.

Finally evidence was offered by the captain that there was no leak in the vessel during the early part of the voyage before the rough weather was encountered, and he accounts for the water which the vessel took entirely by reason of the violence of the storm. Reference was made during the testimony and during the argument of the case to some evidence of the surveyor Stein that the seams in the vessel at two or three places were so wide apart that it was possible to insert a ³⁄₁₆-inch ruler through the shell planking, and, indeed, through the seams of the ship. It is argued that this is an extravagant statement at least, because it would have been impossible for the vessel, after having been loaded and after going to sea, to proceed without taking substantial quantities of water through these openings. It is not necessary to conclude that the openings in the seams were so very large that the vessel needed to be pumped all the time in order to find that there was defective caulking. It must also be borne in mind that the log of the ship, which has been produced in court, has very little, if any, information in regard to the amount of water in the ship during the voyage, and it may well be that, before the rough weather was encountered, the pumps were adequate to keep the water in the hold within bounds, notwithstanding the defective caulking. It is also most important in the opinion of the court that after the vessel returned to Baltimore she was caulked, and that she then went to Newport News where the caulking was continued. There is also evidence that the steam pipe referred to was renewed. The testimony as to the caulking is verified by the captain of the ship, and that as to the renewing of the steam pipe was given by the surveyor Stein and not denied by the captain. No one has been produced to show precisely what repairs were made by the ship. No bills have been offered. No survey on the part of the ship seems to have been made.

Under all these circumstances it seems to the court conservative to state that the great preponderance of the evidence is that the ship was leaky when she sailed, that the owners had notice of her defect, but failed to take time to remedy it.

It is, nevertheless, the theory of the owners of the ship that under the terms of the charter party the shipper took the risk of damage to the cargo, and that the cargo was damaged through no inherent defect in the ship, but through the violence of the weather. It seems also to be the theory of the shipowners that, even though there might have been some unseaworthiness of the ship, nevertheless, there would have been the same damage in a seaworthy ship if the violent winds which are recorded for the dates in question had been encountered. The weather reports show that the wind ranged from 35 to 55 miles an hour at various points on the voyage.

One of the terms of the charter party relates to the loading of the ship, and this is relied on by the shipowner in this case. This clause provides: "The cargo is to be loaded, trimmed and discharged free of expense to the vessel, the vessel providing free use of her tackle and other equipment as on board. Cargo to be shipped on the vessel's skin at the risk and expense of the cargo. Dunnage, if required, to be for vessel's account." The shipowner claims that by the true construction of this language the cargo owners assumed all the risk when they put the cargo on the ship; amongst other risks it took that which has been described as the blowing of the bilges in rough weather, such an occurrence as was noticed in the opinion of this court in the Charles Rohde, 8 F.(2d) 506, 1925 A. M. C. 1594. It may be assumed for the moment that the cargo was shipped at the cargo owner's risk. There are two matters

to be considered in this respect, and the first one is whether any dunnage placed on the ceiling of the ship would have been adequate to protect the cargo in such a storm. The testimony of Mr. Vane, one of the shipowners' experts, is that no wooden ship is safe for the shipment of cargo, no matter how seaworthy she may be if she meets a violent storm; that no amount of dunnage will protect the cargo from the water which will be blown from her bilges. There is uniformity of testimony that all wooden ships leak more or less, no matter how seaworthy they may be, and it was Mr. Vane's opinion that water so taken would necessarily be blown through the crevices of the ceiling, so that no dunnage would protect a cargo unless it was at least three feet high, and that such dunnage would be impracticable. The other witnesses in the case do not go so far, but content themselves with saying that wooden ships generally will leak, but the burden of their testimony is that dunnage will protect the cargo. The court is unable in this case, upon the testimony referred to, to reach the conclusion that all wooden ships are to be condemned as inefficient carriers of goods in rough weather. The preponderance of the evidence is the other way.

There remains in this connection the other question, whether the dunnage in this case was adequate. It consisted of boards or timbers of some four inches thickness which were placed upon the ceiling over the bilges. It is the testimony of Surveyor Stein that, if the ship was tight, the dunnage was sufficient; of Mr. Vickers, the head stevedore superintendent for the shipper, that in his experience dunnage of this sort was adequate, and there is the further persuasive circumstance that the dunnage that was actually used was furnished by the ship, and it would be a fair inference, if there were no testimony to the contrary, that the ship would not furnish inadequate and insufficient protection to the cargo.

■■ On the other hand, there is the testimony of several witnesses, the captain of the ship, Surveyor Leach and Surveyor Schilpp, to the general effect that dunnage should be more than four inches in height and should run from five to eight inches, varying according to the witness. There need be no citation of authority that the burden of proof as to this excuse for the damaged condition of the cargo is upon the ship, and, after a careful consideration of the evidence on the point, the court is unable to say that the dunnage in this case was not adequate. There is testimony to

the contrary. But it seems to the court that it is sufficiently offset by the testimony of experienced men who gave evidence for the libelant which, when taken with the fact that the ship furnished the dunnage in question, makes the court unable to say that the charge of inadequacy of dunnage has been proved.

Moreover, it is the opinion of the court that the clause in question does not have the meaning for which the ship contends. It is said that the important sentence is this: "Cargo to be shipped on the vessel's skin at the risk and expense of the cargo." This is said to be an all-inclusive phrase, and indicates that any damage to the cargo from the placing of the cargo on the vessel's skin is to be borne by the shipper. This sentence, it is contended, should influence the interpretation of the following one, which is, "Dunnage, if required, should be for vessel's account," and from this combination of sentences it is urged that the shipper takes all the risk of shipping on the skin or of determining what kind of dunnage should be used and of seeing that it is furnished, and, if the shipper fails to require the proper dunnage, then the loss is at his risk.

It seems to the court that it is reasonable to apply to the interpretation of this clause the rule which was laid down in the Caledonia, 157 U. S. 124, 15 S. Ct. 537, 543, 39 L. Ed. 644, where the court, speaking of exceptions in a bill of lading, exempting the shipowner from certain liabilities, said: "As the exceptions were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them."

■ This charter party is on a printed form furnished by the ship's brokers. The exceptions referred to are in typewriting. But there seems no good reason to the court why these exceptions, having been put in by the brokers for the benefit of the vessel, should not be construed strictly against the vessel. To the mind of the court these sentences indicate an alternative option offered to the shipper: The cargo may be shipped upon the skin of the ship, and, if so, the shipper takes the risk; the cargo may be deposited upon dunnage, if the shipper prefers, and, if so, the dunnage is to be furnished by the vessel and charged to the vessel's account. Under this interpretation it is the duty of the vessel to furnish the dunnage, and it seems unreasonable to charge the shipper with the responsibility for getting the proper kind of dunnage. While the shipper in this case happens to be an experienced one, certainly it had no particular knowledge of the requirements of this

particular ship, and when the shipper gave notice, as he did in this case, that dunnage would be required, it was the vessel's duty to furnish adequate dunnage, and, if such was not furnished, the risk was the vessel's, and not the shipper's. There is a difference, it seems to the court, between the circumstances of the case at bar and that of the Harry F. Hooper (D. C.) 42 F.(2d) 758, 1930 A. M. C. 1071, and in the case of the Elizabeth Edwards (C. C. A.) 27 F.(2d) 747, 1928 A. M. C. 1281, for in these cases it is clear that the risk of the particular stowage was taken by the cargo owners, and there was no such alternative clause as that referring to dunnage in the charter party in this suit.

It is the conclusion of the court that the libelant is entitled to a decree, crediting, however, thereon the amount of freight money retained, and that the cross-libel of the owner of the ship for freight should be dismissed.