STANDARD OIL CO. OF CALIFORNIA v.
UNITED STATES et al.

No. 3490–BH.

District Court, S. D. California,
Central Division.

Feb. 17, 1945.

Lawler, Felix & Hall and Marcus Mattson, all of Los Angeles, Cal., for libelant.

Charles H. Carr, U. S. Atty., of Los Angeles, Cal., and Lillick, Geary, McHose & Adams and Augustus F. Mack, Jr., all of Los Angeles, Cal., for respondents.

HARRISON, District Judge.

This is a proceeding in admiralty wherein libelant seeks damages under the Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752, for the commingling of part of a cargo of gasoline and Diesel oil shipped on the tanker "Egg Harbor," a vessel owned and operated by the United States of America, by and through the War Shipping Administration.

This case presents two broad questions of law, namely:

1. Does the Carriage of Goods by Sea Act apply to the shipment involved?

2. Did the War Shipping Administration exceed its power in executing a charter party wherein it created a liability against the United States for all provable damages including attorney's fees?

According to the evidence the "Egg Harbor", a Swan Island tanker, on its maiden voyage to Point Wells, Washington, received from the libelant at San Pedro, California, 60,933.31 barrels of marketable Standard Diesel furnace oil, and at El Se-

gundo, California, 63,789.52 barrels of marketable Standard gasoline. Upon arrival at Point Wells, Washington, tests were taken by means of lowering small containers into the tanks. Observing and smelling the contents, failed to disclose any contamination. The libelant also took samples at the dock end of the hose when the pumping of both products began and at spaced intervals thereafter. By this means, it was discovered about three hours after pumping commenced, that contaminated gasoline was being discharged. The pumps were immediately shut down but later pumping was resumed, and the contamination continued. Thereafter, the Diesel oil was unloaded separately without contamination. After the Diesel oil was unloaded, the remainder of the gasoline was removed free from contamination. Later, on the following day, it was discovered through laboratory tests that part of the Diesel oil had been contaminated with gasoline. As a result of this commingling 8,140 barrels of Standard gasoline and 23,131 barrels of Diesel oil were so contaminated by the admixture as to require reprocessing. And in addition thereto, 11,339 barrels of Standard gasoline and 2,376 barrels of Standard Diesel oil already in the shore tanks into which the contaminated products were pumped became so contaminated by this admixture as to also require reprocessing.

All the above oil products had to be reprocessed at the libelant's plant in El Segundo, California, as they had no market value in their contaminated condition at Point Wells, Washington. If libelant is entitled to recover damages for all the oil contaminated, it would be entitled to recover the sum of $49,158.12. On the other hand, if it is entitled to recover only for that portion of the cargo damaged, it would be entitled to the sum of $32,914.56.

■ The first question to be determined is whether the Carriage of Goods by Sea Act covers the shipment of oil involved. The libelant contends that it does, while the respondent holds to the contrary, because the vessel was operating under a charter for the full capacity of the vessel and therefore respondent was free to contract as a private party. Under this reasoning the parties were in the relationship of a bailor and bailee. Respondent then refers to paragraph 19 of the charter party which provides:

"Except as may otherwise be indicated in Part I, the vessel shall not be responsible for * * * any consequences aris-ing out of shipping more than one grade of cargo."

It naturally follows that if the Carriage of Goods by Sea Act does not apply, the libel must be dismissed because of the above provision. But it appears clear to me that said act, 46 U.S.C.A. § 1300 et seq., clearly applies and the rights and liabilities of the parties are controlled thereby. Paragraph 25 of the charter party is entitled "Clause Paramount" and reads as follows:

"All Bills of Lading issued hereunder shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated therein, and nothing therein or herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of any Bill of Lading issued hereunder be repugnant to said Act to any extent, such term shall be void to that extent but no further."

The Carriage of Goods by Sea Act is made applicable to the carriage of goods between ports of the United States if the "bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea between such ports" contains "an express statement that it shall be subject to the provisions of this Chapter and Section 25 of Title 49." Reading paragraph 25 of the charter party in connection with this language in the Carriage of Goods by Sea Act leads to the inescapable conclusion that there was a sufficient incorporation of the Act to make it a part of the contract of carriage.

Respondent relies strongly on The G. R. Crowe, 2 Cir., 294 F. 506. In that case action was brought to recover for loss of gas and oil caused by leakage. The cargo was shipped under a charter party for the full capacity of the vessel. The court held that the agreement between the parties for the full capacity of the vessel amounted to a contract for private carriage and therefore the Harter Act, 46 U.S.C.A. § 190 et seq., a predecessor to the Carriage of Goods by Sea Act, did not apply. This view has been substantiated by numerous other decisions both prior and subsequent to the Crowe case. Hine et al. v. New York & Bermudez Co., D.C., 68 F. 920; The Fri, 2 Cir., 154 F. 333; Lake Steam Shipping Co. v. Bacon, D.C., 129 F. 819; The Royal Sceptre, D. C., 187 F. 224;

The Rokeby, D.C., 202 F. 322; The Elizabeth Edwards, 2 Cir., 27 F.2d 747. While a common element exists between these cases and the one at bar in that the parties have contracted for the full capacity of the vessel and have thereby placed the respondent in the position of a private carrier, there also exist fundamental differences. In the instant case there was an express incorporation of the Carriage of Goods by Sea Act into the charter party,— an element entirely lacking in the cases cited by the respondent. Furthermore, under the Carriage of Goods by Sea Act, which is controlling in this case, there is a provision giving effect to its incorporation in the charter party. This provision is not found in the Harter Act under which the Crowe and like cases were decided.

Even under the Harter Act cases have recognized that it may be incorporated into contracts where it would not otherwise govern by its own force. In Framlington Court, 5 Cir., 69 F.2d 300, 304, it was stated:

"Having incorporated the Harter Act by reference in the charter, the parties are bound to take it with its burdens as well as its benefits and it is controlling."

In Warner Sugar Refining Co. v. Munson S. S. Line, D.C., 23 F.2d 194, 196, the court said:

"The charter party now under consideration gave the charterer the full capacity of the ship Munamar, and as such it was not a common carrier, and the Harter Act * * * would not of its own force have applied, but the contracting parties have expressly made it a part of their contract, which they were at liberty to do."

See also The Vermont, D.C., 47 F.Supp. 877; The Agwimoon, D.C., 24 F.2d 864.

It is therefore apparent that the parties could do exactly what they did do, namely, make the Carriage of Goods by Sea Act a part of their charter notwithstanding the fact that the respondent was contracting as a private carrier. It would appear therefore that paragraph 19, in so far as it attempts to relieve respondent from its own responsibilities, is in conflict with the terms of the Carriage of Goods by Sea Act and is inapplicable. 46 U.S.C.A. § 1303(8).

Having determined that the Carriage of Goods by Sea Act applies, the responsibility of the respondent under the Act must then be determined.

Title 46 U.S.C.A. § 1303 provides as follows:

"(1) The carrier shall be bound, before and at the begining of the voyage, to exercise due diligence to—

"(a) Make the ship seaworthy;

"(b) Properly man, equip, and supply the ship;

"(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

"(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

And § 1304 of Title 46 U.S.C.A. places the burden of proving the exercise of due diligence upon the carrier whenever the loss has resulted from unseaworthiness.

At the outset it should be noted that in undertaking to transport oil the respondent charged itself with a high degree of care. As stated in The Turret Crown, 2 Cir., 297 F. 766, 768:

"Oil is much more difficult to contain than water. Small leaks in a water tank tend to correct themselves by the formation of rust; whereas oil not only does not cause rust, but tends to dissolve rust * * * ." The Arakan, D.C., 11 F.2d 791; American Linseed Co. v. United States, D.C., 40 F.2d 657.

This statement becomes more important when considered in the light of the testimony of two expert witnesses as to the necessity of using spectacle flanges in blocking off one tank in the vessel from another. A spectacle flange consists of two metal fittings connected by bolts and separated by a flat, round piece of sheet metal. When installed in a length of pipe this metal flange acts as a dam by blocking off the flow of liquid. While the vessel was equipped with some spectacle flanges, those were not closed. The vessel was laid out in nine separate tanks. Each of these tanks was connected by a series of pipes running between them. The cargo in this case was distributed as follows: The Standard gasoline was put in tanks 2, 3, 4 and 9, and the Diesel oil was put in tanks 5, 6, 7 and 8. On the pipes connecting these tanks were "double cross-over valves," which were operated from the deck of the vessel by means of a wheel attached to a rod extending down to the valves. These valves were the only means of preventing the cargo of one tank from becoming mixed with another. According to the testimony of the chief pumper, he

personally set these valves so that the "tell tale" indicated they were closed, and he also chained and sealed them. The chief pumper revealed that certain pressure tests were made of the pipes, connections and valves on the trip down from the fitting docks to San Pedro. Taking these statements as true, there was still no way of being certain that the valves would block off the two cargoes. Rust, nails, or any type of foreign matter could have prevented the valves from setting properly. Furthermore, it was necessary to rely on the valves remaining untouched by the members of the crew if we assume they were properly closed when the products were loaded. On the other hand, the use of spectacle flanges would have guaranteed the separate shipment of the cargo and removed the element of risk. Accordingly, in the light of the precarious nature of the cargo, the fact that it was the ship's maiden voyage, the uncertainty of the proper setting of hand valves, and the inevitable reliance on the good judgment of the crew not to alter the valves, it is my opinion, that in not using spectacle flanges which could have been installed expeditiously and inexpensively, and not closing those that were installed, the respondent was guilty of a failure to exercise due diligence to make the ship seaworthy for the carriage of oil and gasoline.

Mr. Justice Gray in The Sylvia, 171 U.S. 462, 19 S.Ct. 7, 8, 43 L.Ed. 241, stated:

"The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."

And again in The Bill, D. C., 47 F.Supp. 969, 977, we find the following:

"The ship owner and the crew must * * * be held to familiarity with the particular construction and design of the ship and its apparatus, and with the characteristics and effect of particular cargoes which the vessel carried."

The respondent at no time made any explanation accounting for the contamination. Its representatives inspected the vessel shortly after the contamination was discovered and had full opportunity to ascertain the cause thereof but would admit nothing, except that "the cross-over valves" on tank 5 were found partially open. It is significant that forthwith one of the mates was relieved from duty but no explanation for such action was given.

■ Even if the failure to use spectacle flanges instead of "double cross-over" valves might not be deemed as lack of due diligence in making the vessel seaworthy, the respondent under said Section 1303(2) of Title 46 U.S.C.A. had the responsibility of properly and carefully discharging the cargo and this it did not do. Having received the Diesel oil and gasoline in marketable condition, the failure to deliver it in like condition would indicate that it had not been discharged properly and carefully in the absence of any explanation to the contrary. The Joseph J. Hock, 2 Cir., 70 F.2d 259, 260.

■ In order to recover for the loss resulting from the reprocessing of this oil and gasoline the libelant must bring itself within the rule governing special damages in contract cases as expressed in 9 Am.Jur., Carriers, Section 789, p. 909, as follows:

"Under certain circumstances, damages may be recovered as within the contemplation of the parties, although they are in excess of those which would ordinarily be considered the natural and probable consequence of the default of the carrier. Special damages may be recovered for the damages arising out of special circumstances known to the parties. In all such cases, the carrier must have had notice of the special circumstances which give rise to the damages. * * * It is not always necessary, however, that the special facts actually within the contemplation of the parties should be mentioned in the negotiations, or in express terms made a part of the contract. Whenever they are known to the carrier, under such circumstances, or they are of such a character that the parties may be fairly supposed to have them in contemplation in making the contract, such special facts become relevant in determining the question of damages. It is not essential that the intended use and application of the goods to be carried should, in all cases, be expressly brought to the carrier's notice at the time they are received, but the carrier may be liable whenever such special use could be reasonably inferred from the known circumstances."

A similar statement of the law will be found in Simons-Mayrant Co. v. Atlantic Coast Line R. Co., D. C., 207 F. 387.

■ Under this rule, in the absence of anything in the charter party to the contrary, it would only be necessary to find that at the time the respondent undertook to transport the oil and gasoline it could be reasonably inferred from the known

circumstances that contaminated products from the vessel might and would likely be pumped into tanks already containing uncontaminated products. In the light of the nature of the product, the methods used in discharging it, and the experience of the parties concerning the unloading and storage of petroleum products it might be reasonably assumed that this disposition of the cargo was within the contemplation of the carrier.

■ But the respondent points to paragraph 7 of the charter party which reads in part:

"The cargo shall be pumped * * * out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its Consignee."

The respondent claims that this relieves the carrier from liability after the cargo left the permanent hose connections. That would be true if the act causing the damage occurred after the cargo had left the permanent hose connections. But here the damage to the cargo occurred on board the vessel—a place where under paragraph 7 and the Carriage of Goods by Sea Act, the carrier was still responsible for the care of the cargo. The fact that the damage did not result until the cargo had passed the permanent hose connections could in no way relieve the carrier from the original breach. The charter party is one instrument and should be read as a whole (Emmons Coal Mining Corporation v. Sir R. Ropner & Co., 3 Cir., 31 F.2d 948; Nicholson Transit Co. v. Nicholson Universal S. S. Co., 6 Cir., 60 F.2d 90; The Framlington Court, 5 Cir., 69 F.2d 300) and therefore paragraph 7 should be read in connection with paragraph 34 which states: "Damages for breach of this Charter shall include all provable damages, * * *." Thus, the damage to the oil in the storage tank being provable as a breach of the undertaking of the carrier, paragraph 7 should not be so construed as to limit recovery as provided in said paragraph 34.

■ The charter party under consideration was prepared by the War Shipping Administration for the carriage of Petroleum and/or its products in bulk on vessels. It is on a printed form headed "Form No. 104—Warshipoilvoy 6/1/42." Use of this form was required by an order of the War Shipping Administration published in 46 Code of Federal Regulations § 303.2. This being the case the charter party must be strictly construed against the respondent. The Helen Barnet Gring, D.C., 48 F.2d 629; The Pensacola, 5 Cir., 263 F. 661; Compania de Navigacion La Flecha v. Brauer et al., 168 U.S. 104, 18 S.Ct. 12, 42 L.Ed. 398.

■ There seems to be no serious question that attorney's fees may be recovered as part of the damages if so stipulated in the contract. 25 C.J.S., Damages, § 50, pp. 531–533; United States Fidelity & Guaranty Co. v. Highway Engineering & Construction Co., 5 Cir., 51 F.2d 894; Ghirardelli v. Peninsula Properties Co., 16 Cal.2d 494, 107 P.2d 41.

Having determined that the charter party creates a liability upon respondent for all damages including attorney's fees as a part thereof, in the event the parties thereto were private contractors, it must now be decided whether the War Shipping Administration had the authority to bind the United States under said charter party.

■ In approaching this problem it must be borne in mind that if Congress has not under proper legislation waived immunity from suit, such cannot be accomplished by an administrative agent. Munro v. United States, 303 U.S. 36, 58 S.Ct. 421, 82 L.Ed. 633; United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888; Stanley v. Schwalby, 162 U.S. 255, 16 S.Ct. 754, 40 L.Ed. 960; Jones v. Tower Production Co., 10 Cir., 120 F.2d 779. While this is true, in none of these cases did Congress go so far in waiving sovereign immunity as it did in the Suits in Admiralty Act and the Merchant Marine Act.

Recently the Supreme Court has expressed the view that when the Government enters the field of commercial activities a liberal approach will be taken to the question of immunity from suit. F. H. A., Region No. 4 v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724; Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; Reconstruction Finance Corporation v. J. G. Menihan, 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595. In Brady v. Roosevelt S. S. Co., 317 U.S. 575, 63 S.Ct. 425, 428, 87 L. Ed. 471, it was stated:

"For when it comes to the utilization of corporate facilities in the broadening phas-

es of federal activities in the commercial or business field, immunity from suit is not favored. * * * Congress adopted that policy when it made corporations wholly owned by the United States suable on maritime causes of action under § 2 of the Suits in Admiralty Act."

Section 207 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1117, later transferred to the War Shipping Administration under Executive Order No. 9054, February 7, 1942, 50 U.S.C.A.Appendix, § 1295 note, 7 Fed.Reg. 837, provides in part as follows:

"The Commission may enter into such contracts, upon behalf of the United States, * * * as may, in its discretion, be necessary to carry on the activities authorized by this chapter, * * * in the same manner that a private corporation may contract within the scope of the authority conferred by its charter."

█ While my attention has not been called to any decision interpreting this provision of the law, it appears to me that the language thereof is clear and explicit and if it means what it appears to say, the War Shipping Administration has the same authority as any private corporation to enter into contracts and if it has that authority, it has the power to bind the United States by the terms of said contract. This would appear to be in conformity with the purpose of the act as set forth in Section 1101 of Title 46 U.S.C.A. and its predecessor the U. S. Shipping Board Merchant Fleet Corporation.

In an opinion of the Attorney General of the United States dated March 23, 1943, among other things he stated:

"In view of my conclusion that the restrictive provisions here involved were not intended to apply to the situations described above, it is unnecessary for me to consider the effect, in this connection, of Section 207 of the act of June 29, 1936 (49 Stat. 1985, as amended) and of Executive Orders No. 9054 (7 Fed.Reg. 837) and No. 9244 (ibid., 7327), which authorize the War Shipping Administration to enter into contracts "in the same manner that a private corporation may contract within the scope of the authority conferred by its charter. I may note, however, that section 207 * * * has been construed to authorize departures from the usual rules governing the making of Government contracts when the unusual or business character of the activities involved so require (Comptroller General's Decisions, A-51647, March 27, 1941, and B-15611, January 12, 1942)."

In House Report No. 2168, 75th Congress, 3rd Session, referred to in the opinion of the Attorney General, I find the following language:

"Under the act, the Maritime Commission has all the general and implied powers of a business corporation."

See also Benedict on Admiralty, Vol. I, 6th Ed., page 452.

It appears that when the War Shipping Administration drew up the form which constitutes the charter party herein in question (46 Code of Fed.Reg. 303.2), it was exercising the power conferred upon it by Congress. It was certainly the intent of Congress to permit the War Shipping Administration to freely enter into charter parties and in entering into such agreements knew that the ordinary and usual responsibilities and liabilities must be assumed by it. It knew that the government was entering a field wherein it would be in competition with private carriers and in order to compete it would have to assume the same liabilities as private carriers.

█ Furthermore, when Congress under the provision of said Sections 741–752 of Title 46 U.S.C.A. waived the sovereign immunity of the United States and permitted suits to be brought against the government to the same extent as such suits could be maintained against private parties, it expressly subjected the government to liability for all damages resulting from the operation of government owned vessels. In said sections it has in no way limited its liability and it would appear that under such circumstances all elements of damages could be recovered. When attorney's fees are made by agreement an element of damages, I see no logical reason why the United States should not be liable therefor to the same extent as a private party. It has assumed the liability of an ordinary carrier and should not be permitted to evade it.

█ I therefore hold that the United States of America having lawfully assumed the responsibilities fixed by said paragraph 34 of the charter party, it became liable for damages as therein provided. I hereby find that the sum of $8,000 is a reasonable amount to be allowed to said libelant as attorney's fees to be added to the sum of $49,158.12, the amount allowed for the contamination of all the libelant's oil products. Libelant is also allowed interest on

said sum of $49,158.12, at the rate of 4% per annum from April 23, 1943, together with costs herein incurred.

Libelant is directed to promptly prepare findings and decree in accordance with this opinion.