ESSO STANDARD OIL COMPANY, a Delaware Corporation, Libelant,

v.

THE S/S KAPOSIA, her engines, boilers, etc., and American Tankers Corporation of Delaware, Respondents.

United States District Court
S. D. New York.

Jan. 25, 1957.

As Modified March 29, 1957.

Kirlin, Campbell & Keating, New York City, for libelant. Ira A. Campbell, Elmer C. Maddy, New York City, of counsel.

Satterlee, Browne & Cherbonnier, New York City, for respondents. Thorolv T. Waaland, William P. Hepburn, New York City, of counsel.

DAWSON, District Judge.

This is an action in admiralty, seeking damages for contamination of certain petroleum products. It is alleged and not denied that respondent, American Tankers Corporation of Delaware, was the charterer in possession of the tanker S/S "Kaposia" and that certain petroleum products were delivered to this tanker by the libelant at Baton Rouge, Louisiana, for transportation to the Harkness Point Terminal of libelant at Philadelphia, Pennsylvania. The cargo consisted in part of Essoheat Medium (a heating oil), in part of diesel oils, and in part of gasoline. It is alleged that upon delivery of the cargo, damage resulted to the libelant from commingling of the heating oil with the gasoline, and that this also resulted in the contamination of some previously sound Essoheat Medium in one of libelant's shore tanks.

The fact that contamination occurred is undisputed. The principal issue is whether the contamination occurred by reason of acts of employees of libelant or by reason of acts of employees of respondent.

The Court finds the following facts:

1. Libelant delivered to the respondents at Baton Rouge the following products in good order and condition:

| Cargo | Net 42 U.S. Gal. Bbls. at 60° F. |
| --- | --- |
| Esso Gasoline | 31,673.12 |
| Unleaded Gasoline | 19,800.57 |
| Diesel 208 | 8,830.52 |
| Diesel 210 | 33,385.71 |
| Essoheat Medium | 10,662.34 |

2. The cargo was carried pursuant to the terms of a charter party, which provided in part as follows:

Clause 7 provides:

"The cargo  *  *  *  shall be pumped out of Vessel  *  *  *  but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where the delivery of the cargo shall be taken by the Charterer or its Consignee.  *  * "

Clause 20 provides:

" *  *  *  The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from  *  *  *  (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo."

Clause 21 provides:

"The Vessel, her Master and Owner shall not, unless otherwise in this Charter especially provided, be responsible for any loss or damage arising or resulting  *  *  *  from any other cause of whatsoever kind arising without the actual fault or privity of the Owner."

3. When the cargo arrived at Philadelphia, the products in the several tanks on the tanker were tested by the libelant and no contamination was found. There

was no evidence that any contamination occurred during the voyage.

4. The tanker arrived at libelant's terminal at Philadelphia on July 25, 1951, and arrangements were made to pump the cargo from the ship to libelant's shore lines which connected with libelant's tanks at the terminal.

5. The steamer dock, which was controlled by libelant, had three rubber hoses which connected to pipes on the dock. Each pipe led to a header which directed the cargo to the field conduits which emptied into the storage tanks. The header itself functioned as a switch board. Built into the header were three valves which controlled the direction of the product. To send the product into a particular conduit it was necessary to open the appropriate valve. In other words, if gasoline was discharged into one of the headers from the ship and was destined for a gasoline tank, it would be necessary to open the plug valve connecting the header with the gasoline line. So also, if heating oil were in a header and was to be sent to a heating oil tank, it would be necessary to open a plug valve connecting to the line leading to the heating oil tank. The control of these plug valves was in the hands of employees of libelant. Before each product reached the header, it passed through a pipe with a sample cock from which samples could be taken for testing.

6. The tanker had three systems for storing the products and three pumps for discharging them. These systems were known as the Starboard, Center and Port Systems, and on the voyage in question, had the following products in the following tanks:

Starboard System— Tanks 1 and 2—White Gasoline
Tanks 3 and 4—Esso Gasoline

Center System — Tanks 5 and 6—Diesel Oil 208 Distillate

Port System — Tanks 7 and 8—Diesel Oil 210
Tank 9 —Essoheat Medium (heating oil)

The Starboard System connects directly with the starboard pump; the Center System connects directly with the center pump; and the Port System connects directly with the port pump. In addition, these systems are interconnected both through cargo lines controlled by "crossover valves" in the No. 5 and No. 7 tanks, and by additional crossovers in the pump room. As a result, cargo from any of the tanks can be discharged through pumps other than the one directly connected with the system.

7. Discharge of the products from the ship began at 7:05 a. m., E.S.T., on July 25. As calculated on the ship which used Standard Time, discharge began at 8:05. The hoses from the ship were connected with the appropriate lines leading to the headers on the dock. As the products were discharged, samples were taken at the sample cock at five-minute intervals by employees of the libelant. The two samples taken at 6:45 p. m. revealed no contamination in either the No. 1 or the No. 3 lines. The No. 1 line carrying heating oil connected the ship's Port System to the No. 1 header which directed the fuel to the Essoheat Medium tank in the field. The No. 3 line carrying Esso gasoline connected the ship's Starboard System to the No. 3 header which directed the fuel to an Esso storage tank. Five minutes later, at 6:50 p. m., the dock man took another set of samples and discovered that the heating oil in No. 1 line was contaminated with gasoline. He advised the ship and all pumps were shut down. The yard superintendent of libelant arrived shortly thereafter and took samples from the shore lines running out from the header to the shore tank. The line was found to contain heating oil contaminated with gasoline. The chemist of li-

belant then arrived and went to the vessel and took samples from both the port and starboard pumps. The sample taken from the starboard pump showed that it contained gasoline, but the sample taken from the port pump showed it to contain heating oil contaminated with gasoline. Shore tank No. 60, into which the heating oil was being discharged, was tested by the chemist and found to contain heating oil contaminated with gasoline.

8. The evidence established that the amount of gasoline delivered at Philadelphia was 891.14 barrels less than the amount which had been loaded at Baton Rouge. Libelant contends that this gasoline was mixed with the heating oil and resulted in the contamination.

9. The fact of the contamination is not in dispute. The testimony was clear that no mixture occurred before the unloading began; the ship's No. 9 tank, which contained the heating oil, was tapped both before and after the contamination was detected and proved at all times to be free of gasoline. How then in the course of discharge did the gasoline get mingled with the heating oil? The evidence establishes that it was physically possible for the contamination to have been produced on the ship. At the same time it is not clear that any combination of circumstances on the shore would have caused gasoline to appear in the No. 1 line between the ship and No. 1 header.

Physically, the ship could have discharged gasoline through the No. 1 line if the crossover valves at tanks No. 5 and No. 7 were open. Respondent relies upon testimony by the ship's officers that these valves were in fact closed, and in addition contends that gasoline could not have passed through the Port System (No. 1 line) without contaminating the heating oil in tank No. 9. The evidence establishes that under flow conditions, that is while the port pump was in operation, it was physically possible for gasoline to pass through the No. 1 line without mixing with the heating oil in No. 9 tank. Similarly if a crossover valve were closed before the port pump

was stopped, No. 9 tank could have remained uncontaminated.

On behalf of the ship it is urged that mismanipulation of the header valves on shore produced the contamination. It is clear that opening the wrong valve could result in an admixture in the line between the header and the storage tanks. The evidence indicates, however, that the heating oil in the line between the ship and header would remain substantially unaffected.

Contamination was first detected in No. 1 line which was tapped at the sample house. This line extends from the ship, through a swing valve to the sample house, and then on to the header. The substantial quantity of gasoline detected in this line could not have been a back flow from No. 1 header. Respondents urge that the pressure in No. 1 line (heating oil) was 12–15 pounds per square inch but 35 pounds per square inch in No. 3 line (gasoline). Consequently, respondent contends, if both the heating oil and gasoline valves were open in No. 1 header, then gasoline from the No. 3 header dropping down into the gasoline conduit could flow *up* several feet through the connection leading from the No. 1 header. Upon reaching No. 1 header the gasoline, it is alleged, would proceed back down the No. 1 line despite the forward pressure of the heating oil and pass through the sample house and by the check valve and on to the ship's flange.

I find that respondent's hypothesis does not appear to be reasonably probable and that there is a greater likelihood that the gasoline was emitted by the Port Cargo System without contaminating No. 9 tank. There was no direct testimony that the crossover valves on the ship were open, any more than there was any direct testimony that the wrong valve had been opened at the header.

However, the testimony and exhibits are sufficient to convince the Court that if the wrong header valve had been opened the contaminated sample would not have been discovered at the sample cock nor would it have been discovered at

the port pump on the ship nor at the ship's flange where its line was coupled to the shore hose. Two reasons requiring this conclusion are readily apparent: (1) a back flow of gasoline would have had to overcome the flow of heating oil coming from the ship toward the sample house which was on the line before it reached the header; and (2) any back flow to the ship or the ship's flange would have been stopped at the check valve unless it was malfunctioning.

■ 10. The libelant has the burden of establishing that the contamination was the result of negligence of the ship or its employees. To meet this burden of proof, it established the following facts which are found by the Court:

(a) That the contamination was first discovered in the sample cock which was a part of the shore line *before* the product reached the header and that the contaminated condition, therefore, must have been the condition which existed at the time the product left the ship.

(b) That immediately after the contamination was discovered, a sample of the product taken at the port pump established that this product, before it had left the ship, was in a contaminated condition.

(c) That about 10:30 p. m. the hose connection between the ship's lines and the shore's lines was broken and the product at this point of intersection was found to be contaminated.

(d) That the amount of uncontaminated gasoline out-turned by the vessel was less than that which had been loaded on her.

In my opinion, the evidence was sufficient to show that the contamination occurred before the product got to the shore line and, if so, such contamination was the result of the negligence of employees of the ship.

■ As an alternative defense, respondent urges that this claim is barred because not filed within the year statute of limitations embodied in the Carriage of Goods by Sea Act, 46 U.S.C.A. §§ 1300–1315. On its face the statute does not apply as § 1305 declares that the Act is inapplicable to charter parties. It is contended, however, that Clause 32 of the charter party, reading as follows, expressly incorporates the limitations period of the Act:

> "Any provision of this charter to the contrary notwithstanding, the Owner shall have the benefit of all limitation of, and exemption from, liability accorded to the Owner or chartered owner of vessels by any statute or rule of law for the time being in force."

This generalized language falls short of the particularity and specificity required to indicate that the parties had intended the Act to form part of their contract. See, e. g., United States v. The South Star, 2 Cir., 1954, 210 F.2d 44.

The Court concludes:

■ 1. Respondent, having received certain gasoline and heating oil, each uncontaminated, was obliged to deliver those products in a like uncontaminated condition. Standard Oil Co. of California v. United States, D.C.S.D.Cal.1945, 59 F.Supp. 100, affirmed, 9 Cir., 1946, 156 F.2d 312.

2. Respondent delivered to libelant's shore lines heating oil contaminated with gasoline.

■ 3. Respondent is liable in damages to libelant for damages proximately resulting to libelant from the delivery of the contaminated product, which includes the value of the product not properly delivered and also the damages to libelant's property in the shore tank resulting from the admixture in the shore tank of the contaminated product delivered by the respondent.

4. That judgment should be entered for libelant.

The parties have agreed that the amount of damages should be determined by a Commissioner and, therefore, no testimony was taken on the issue of damages.

. This opinion shall constitute the findings of fact and conclusions of law of the Court.

Submit interlocutory decree within fifteen days from the date of this opinion.