The NAPHTHA SOLVENTS CO., Inc.

v.

ESSO STANDARD OIL COMPANY, Tankerman's Service, Inc., E. W. Saybolt & Co., Louisiana Marine Repair & Service Co., Inc., and Louisiana Marine Ways, Inc.

No. 572.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Sept. 24, 1963.

Harry Pollock, and James B. Kemp, Jr., Pittsburgh, Pa., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for libelant.

Wallace A. Hunter, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for respondent Esso Standard Oil Co.

James F. Pierson, Jr., Alton J. Reine, Jr., Baton Rouge, La., of counsel; Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, La., for respondent Tankerman's Service, Inc.

William A. Porteous, Jr., and William J. Walker, New York City, Porteous & Johnson, New Orleans, La., for respondent E. W. Saybolt & Co.

George B. Matthews, George Frilot, III, Lamle & Kelleher, New Orleans, La., for respondent Louisiana Marine Repair & Service Co., Inc.

WEST, District Judge.

This admiralty libel was brought by libelant, Naphtha Solvents Co., Inc. (Naphtha), as the consignee of a mixed cargo of petroleum products, against Louisiana Marine Repair & Service Co., Inc. (Louisiana Marine), Louisiana Marine Ways, Inc., Tankerman's Service, Inc. (Tankerman's), Esso Standard Oil Company (Esso), and E. W. Saybolt & Co. (Saybolt), seeking to recover damages allegedly sustained when the cargo became contaminated. The barge T–6000, in which the cargo was transported, and the M/V JANE T which towed the barge were both owned by Thomas Petroleum Transit, Inc. (Thomas Petroleum), an affiliate of Naphtha. Each respondent, except Saybolt, filed petitions of impleader under the 56th Admiralty Rule against Thomas Petroleum, who in turn similarly impleaded all respondents named in the original libel. Prior to trial, Louisiana Marine Ways, Inc. was voluntarily dismissed and is therefore no longer a party to this action. Libelant contends that the contamination was caused by one or more of the respondents negligently failing to place certain blanks in the main header line of the barge T–6000 to isolate the different cargoes, one from the other, in their respective compartments. Respondents, on the other hand, contend that they had no obligation to position the blanks, and that furthermore, the contamination was not caused by improper positioning of the blanks, but rather by the negligence of persons other than respondents in the unloading of the cargo.

The case was tried to the Court, after which briefs were filed by counsel for all parties. After considering the evidence and the briefs of counsel, the Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### 1.

Some time prior to January 26, 1958, libelant, Naphtha, agreed to purchase from Esso about 1056 short tons (325,000 gallons) of Varsol, which is a finished product, clear, with a slight odor, together with 216 short tons (66,000 gallons) of naphtha, referred to in the industry as VM&P, which is also a finished product used as a paint thinner, which is darker in color and having a stronger odor than Varsol. About the same time, Neville Company of Pennsylvania, not a party to this action, had agreed to purchase from Esso 1290 short tons (360,000 gallons) of Low Pressure Distillate, referred to in the industry as LPD, which is an unfinished product, requiring further distilling, and being dark in color with a rather objectionable odor.

### 2.

The three petroleum products described were to be transported at the same time

from the Esso Refinery in Baton Rouge, Louisiana to Pennsylvania aboard the compartmented barge, T-6000, towed by the M/V JANE T, both of which were owned and operated by Thomas Petroleum, an affiliate of libelant, Naphtha.

### 3.

The barge T-6000 is of steel construction, about 264 feet long and 50 feet wide, divided into 10 watertight compartments numbered 1 through 10. Compartments numbered 1, 3, 5, 7 and 9 are located from bow to stern along the port side of the barge, with compartments numbered 2, 4, 6, 8 and 10 being located from bow to stern along the starboard side. The compartments are separated from each other by a longitudinal bulkhead running from bow to stern along the centerline of the barge, and transverse bulkheads located approximately equidistant from each other, thus forming the ten watertight compartments of approximately equal size.

### 4.

These compartments are serviced through a main line or "header" running through the bottom of the barge, along the center bulkhead, from bow to stern, having manifolds or risers running from the line up to the main deck. There are three such main risers connected to the main header, one located on the deck over compartment 3, one located on the main deck over compartment 9, and one located on the main deck over compartment 10. Cargo may be loaded or unloaded by use of any of these three risers, thus traveling the cargo into or out of any compartment through the main header line. There are separate lines running off of the main header and into each compartment. The flow of cargo from the main header into each separate compartment is controlled by a separate, individual valve for each compartment located in each line running from the main header into the various compartments. These valves are manually operated from topside by use of a reach rod. As long as these valves are closed, the integrity of the compartment is, of course, maintained. Compartments numbered 5 and 6 also have separate risers servicing those compartments only, which may be used to load or unload those respective compartments directly without using the main header line or the main risers.

### 5.

This barge also has an "H" shaped cofferdam located in the center of the barge, which permits access to the main header. Provision is also made in the main header for the insertion of three "blanks" or metallic discs which, when closed, will isolate cargo in certain compartments from the cargo remaining in the main header line. Access to the blanks is by way of the cofferdam which runs fore and aft between compartments 5 and 6 and athwartship immediately forward of compartments 5 and 6 and immediately aft of the same compartments, forming an "H" shaped passageway. Blank "A", when in place, would isolate the cargo in compartments 1, 2, 3 and 4 from the main header aft of those compartments; Blank "C" would isolate compartments 7, 8, 9 and 10 from the main header forward of those compartments; and Blank "B" separates compartment 5 from compartment 6, the two center compartments.

### 6.

If all blanks, A, B, and C, are closed, compartments 1, 2, 3 and 4 must be loaded through the riser over compartment 3; compartments 7, 8, 9 and 10 must be loaded through the riser over compartment 9, or the one over compartment 10; and compartments 5 and 6 must each be loaded through their own respective individual risers.

### 7.

If all blanks are open, any compartment or combination of compartments may be loaded through any of the main

risers, that is, either the main riser located over compartment 3 or the main risers located over compartments 9 and 10. To load or unload in this fashion requires the proper setting of the individual valves in the lines leading from the main header into the various compartments in order to maintain the integrity of the various compartments.

### 8.

Several days prior to January 26, 1958, the barge T-6000 was placed by its owner, Thomas Petroleum, in the repair facility of Louisiana Marine for some minor repairs, and for cleaning. Minor hull repairs were made, all flanges and valves were tightened and repaired as needed, and the entire system pressure tested. In order to pressure test the lines, all blanks and valves were opened. After work was completed, the barge was delivered to the Esso dock for loading, with all blanks and valves still open.

### 9.

Louisiana Marine had no knowledge of any loading instructions, and received no instructions relative to the positioning of the blanks in the main header line. It was customary for the repair yard to leave all blanks and valves open following testing of the lines.

### 10.

It is ordinarily the duty of the tug captain to spot the barge at the loading dock, and to see that the barge is ready for loading. But in this particular instance, the captain of the Tug JANE T had taken the tug elsewhere and was not available. Consequently, Louisiana Marine spotted the barge at the Esso dock and notified Esso that the barge was available for loading.

### 11.

Whenever a barge is being loaded with petroleum products, the loading must be supervised by a Coast Guard licensed tankerman. In this case, Esso contacted Mr. Frank M. Kemmerlin, the designated tankerman, who was an independent contractor doing sub-contract work for Tankerman's Service, Inc. He received his pay from Tankerman's, who in turn invoiced Thomas Petroleum for the services rendered. Upon reporting to the dock, Kemmerlin received a loading order from the standby shack on the dock. This order made no reference to the position of the blanks, but indicated only that the cargo of Varsol was to be loaded in compartments 1, 2, 3 and 4; the cargo of VM&P was to be loaded in compartment 5; and the LPD was to be loaded in compartments 6, 7, 8, 9 and 10.

### 12.

When Kemmerlin arrived, a hose connection from the shore tank had already been made to the after riser on compartment 10, and Varsol was to be loaded first into compartments 1, 2, 3 and 4. He then checked to see that all blanks were open, and that the individual valves to all compartments but numbers 1, 2, 3 and 4 were closed so that these compartments might be loaded through the riser at compartment 10 to which the hose connection had been made. While the Varsol was thus being loaded through the after riser, Kemmerlin proceeded to load, at the same time, the VM&P into compartment 5 through the individual riser at compartment 5, which riser, as previously stated, did not connect with the main header line. After these compartments were loaded, he proceeded to load the LPD into compartments 6, 7, 8, 9 and 10 using the same main riser at compartment 10 that was used to load the Varsol. Obviously, with the blanks all open, and the LPD being loaded last, at the conclusion of the loading operation, the main header line was filled with LPD.

### 13.

Ordinarily, barges such as this one do not use blanks at all, and the compartments are loaded and unloaded by use of the individual valves only. Thus, the manner of loading this barge was not unusual, and was a reasonable way to load a mixed cargo with all blanks open. Of course, had all blanks been closed, a different manner of loading would have

been required, i. e., compartments 1, 2, 3 and 4 would have to be loaded through the forward main riser at compartment 3; compartments 7, 8, 9 and 10 would have to be loaded through one of the after risers at compartment 9 or 10; and compartments 5 and 6 would have to be loaded through the individual risers.

14.

Thomas Petroleum prepared what purports to be a loading diagram, showing a layout of the barge T–6000, and showing the location of each of the three cargoes to be loaded into the barge. On this diagram is a small box referring to Blanks A, B, and C, and beneath each letter are two squares, one marked "Open" and the other marked "Closed". Each of the three squares marked "Closed" contains a check mark. This diagram was apparently given to both the tug captain and to Esso. Libelant now contends that the check marks amounted to an instruction that all blanks should be closed before loading. The Court does not find that this conclusion necessarily follows. It could merely indicate to Esso or to anyone else seeing the diagram that the blanks were actually closed upon arrival of the barge at the dock; and since the same diagram would be used in connection with the unloading operation, it could also indicate that the blanks should have been closed before unloading operations commenced. At any rate, Kemmerlin did not have a copy of this diagram, and neither Thomas Petroleum nor the tug captain were present to inspect the barge after it left Louisiana Marine. There was nothing to indicate on this diagram that the blanks must be closed by someone before loading operations began, or that the barge could not be properly loaded and unloaded with the blanks open. On the contrary, there are several interpretations that could easily be placed on the meaning of the check marks on the loading diagram, and the evidence clearly shows that the barge T–6000 can be properly loaded and unloaded with the blanks either open or closed.

15.

After the barge was loaded, all valves were carefully checked for closure and leaks by Kemmerlin, and then the cargo in each compartment was checked for quantity and quality by a representative of Saybolt, which company is engaged in the business of inspecting petroleum products. The inspection revealed that there was no contamination of cargo in any of the compartments, and the barge then left, under tow, for Naphtha's facility at Vanport, Pennsylvania.

16.

Upon arrival of the barge at libelant's facility at Vanport, Pennsylvania, the cargo in each compartment was again inspected for quantity and quality by a representative of Saybolt, and found to be completely uncontaminated in all compartments.

17.

After the cargo was checked, analyzed, and approved by Saybolt at Vanport, Pennsylvania, a tankerman by the name of Mr. Koenig G. Hayes, employed for this operation by Thomas Petroleum, took charge of the unloading operations. Because of the fact that he sensed gas in the cofferdam, he did not go down to check the position of the blanks, despite the fact that gas mask equipment and other equipment was available for his use in making such an inspection. He apparently relied on the loading diagram prepared by Thomas Petroleum, which he interpreted to mean that all blanks were closed. There is every reason to believe, from the evidence, that he could have ascertained the position of the blanks by careful inspection from topside, using a flashlight, without actually descending into the cofferdam. Instead of doing this, he assumed the blanks were closed and proceeded to pump the Varsol from compartments 1 and 2 into a shore tank by connecting the hose to the main riser at compartment 3, and opening the valves to compartments 1 and 2. At the same time he connected a hose to the individual riser at compartment 5 in order

to simultaneously unload the VM&P. He did not flush the line before pumping the Varsol from compartments 1 and 2, but he did flush the line before pumping the VM&P. Upon doing so, he immediately saw the LPD was coming out at the pump instead of VM & P, and he immediately stopped the unloading operation. Upon checking the line at riser No. 3, it was found that the Varsol being pumped out of compartments 1 and 2 was also contaminated with LPD, and consequently the pumping operation ceased. Then, for the first time, the blanks were checked and found to be open, exactly as they were when the barge was loaded at Baton Rouge, Louisiana.

18.

There was sufficient LPD in the main header line to contaminate the Varsol being pumped from compartments 1 and 2. The failure of Hayes to flush the line before pumping the Varsol from compartments 1 and 2 caused the cargo in compartments 1 and 2 to become contaminated by the LPD remaining in the main header line after the completion of the loading operations at Baton Rouge. The contamination of this cargo did not take place until after the unloading operation commenced, and it then occurred only because of the negligence of the employee of Thomas Petroleum in failing to flush the lines before pumping the Varsol from the barge. Had due care been exercised in the unloading operation, this cargo could have and should have been successfully discharged from the barge whether the blanks were open or closed.

19.

Since the VM&P was being unloaded through the individual riser at compartment 5, which was not connected to the main header line, the position of the blanks could have had nothing to do with the contamination of this cargo. From the evidence, it would seem that contamination by LPD in this compartment could have been caused only by either a leaky valve, or by a valve from

the main header having been opened by mistake. The fact that Saybolt's inspection of the VM&P at Vanport, Pennsylvania, just prior to the beginning of unloading operations, showed conclusively that the cargo in that compartment was not contaminated, leads this Court to conclude that the contamination which later took place could not have resulted from a leaky valve. Such a defective valve would have allowed contamination to take place during the voyage, and thus be apparent when the cargo was tested. There was certainly far less than a preponderance of evidence to show a defective valve. The only other explanation for the contamination of the cargo in this compartment is that the valve to this compartment was opened unnecessarily when the loading operation began, thus allowing the cargo of LPD remaining in the main header line to be drawn into compartment 5 when the unloading commenced, thus contaminating the VM&P in that compartment.

20.

There is no question but what there was sufficient LPD in the main header line to contaminate the cargo in compartments 1, 2, 3, 4, and 5 if the main line was not properly flushed before unloading the individual compartments. As there was no evidence whatsoever to indicate that the valves leading to compartments 6, 7, 8, 9 and 10, where the LPD was stored, were opened at any time, it is concluded that the main header line was the source of the contamination of the cargo.

21.

Even though it might have been contemplated by Thomas Petroleum, the owner of the barge and tug, that the blanks in the barge would be closed when the barge was delivered to Esso for loading, and that thus the loading and unloading operations would be conducted in a manner different from that used, nevertheless, the libelant has failed to carry the burden of proving any negligence or breach of contract on the part

of anyone except Thomas Petroleum Transit, Inc., and its employees or agents.

## CONCLUSIONS OF LAW

### 1.

This Court has jurisdiction of this action in admiralty, and venue is properly laid in the Eastern District of Louisiana.

### 2.

■ The burden of proof is upon libelant to prove by a preponderance of the evidence that respondents, or any one or more of them, were either guilty of negligence or guilty of a breach of contract proximately causing the damages suffered by libelant as a result of the contamination of the cargo in question. Libelant has completely failed to carry this burden.

### 3.

■■ The evidence in this case leads to the inescapable conclusion that the contamination of the cargo aboard the barge T–6000 did not occur until after unloading operations began at Vanport, Pennsylvania, and that the contamination that then occurred was the direct and proximate result of the negligence of respondent-impleaded, Thomas Petroleum Transit, Inc., whose employees negligently attempted to discharge the cargo of Varsol and VM&P. Thomas Petroleum Transit, Inc. received the cargo aboard its barge at Baton Rouge, Louisiana, in an uncontaminated condition. It was obligated to deliver this cargo to libelant at Vanport, Pennsylvania, in a like, uncontaminated state. Esso Standard Oil Co. v. S/S Kaposia, D.C., 148 F.Supp. 899. All of the evidence clearly supports the conclusion that libelant has failed to prove his claim against these respondents as required by law.

Judgment will be entered herein in favor of respondents, Esso Standard Oil Company, Tankerman's Service, Inc., E. W. Saybolt & Co., and Louisiana Marine Repair Service Co., Inc., and against libelant, dismissing this libel at libelant's cost.