**REGAL FIBERS, INC.**
and
**R. J. Kunick & Co., Inc., Libellants,**
v.
**HOLLAND AMERICAN LINE**
and
**Philadelphia Ceiling and Stevedoring Company, Respondents.**
No. 423 of 1963.

United States District Court
E. D. Pennsylvania.
March 4, 1969.

Kelly, Deasey & Scanlan, Philadelphia, Pa., for libellants.

Krusen, Evans & Byrne, Rawle & Henderson, Philadelphia, Pa., for respondents.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW AND ORDER

WEINER, District Judge.

After a trial before the Court, without a jury, in an Admiralty and Maritime claim to recover damages to a shipment of acrylic fiber on an ocean voyage from Bremen, Germany, to Philadelphia, Pennsylvania, upon pleadings and proof, the court makes the following:

### FINDINGS OF FACT

1. Libellants, Regal Fibers, Inc. and R. J. Kunick & Co., Inc. are Pennsylvania corporations with offices and principal places of business in Haverford, Pennsylvania.

2. Respondent, Holland American Line, is a business organization organized and existing under and by virtue of the laws of the Kingdom of Holland and does business in this jurisdiction through its agent Furness Withy & Co., Ltd., located in Philadelphia, Pennsylvania.

3. Holland American Line was the owner and operator of the S. S. "Sloterdyk", a vessel engaged in the common carriage of merchandise for hire.

4. Respondent, Philadelphia Ceiling and Stevedoring Company is a New Jersey corporation with its principal place of business located in Philadelphia, Pennsylvania, and is engaged in the business of loading and unloading of merchant vessels as a stevedore in Philadelphia, Pennsylvania.

5. Libellants, as partners agreed and did purchase 240,000 pounds of acrylic fiber.

6. The sale was made by Bayer Leverkusen whose factory was located in Germany for a purchase price of $43,702.48.

7. The fiber was located in an open yard adjacent to the warehouse and plant of "Blumenthal's" located in the northern region of Germany.

8. Approximately one month prior to the sale the bales of fiber had been inundated by flood waters.

9. That as a result of being exposed to the flood the bags in which the fiber was packed became wet and the fiber was damp.

10. The material was sold "as is"— "no claims to be accepted", and the invoice bore the legend "Acrylic * * * waste of flood damaged staple fiber, tow, combed and torbo tops".

11. As the fiber was either loose when purchased or the original containers were wet, it became necessary to repack the containers.

12. Libellants retained the services of Uhlmann and Company of Bremen, Germany, for the dual purpose of recoopering the packages containing the fiber and to arrange the shipping to Philadelphia.

13. During the recoopering process an unknown number of bags of fiber were exposed to a heavy down pour of rain that lasted for either two or three days.

14. After recoopering the bags were put into a lorry and then into a railroad car and delivered to the Port of Bremhaven where they were loaded by cargo nets onto the ship "Sloterdyk".

15. The cargo was comprised of 1874 bales, 675 of which were stowed in the upper 'tween deck of No. 6 hold and the

balance in the upper 'tween deck of No. 5 hold.

16. The bill of lading accepted by the shipper described the goods shipped as "1874 bags as per attached specification, 206,452.5 kilos" and further noted "all bags, more or less wet, wrappings partly torn and in bad condition, contents partly exposed".

17. The cargo was put on board the vessel at Bremen, Germany, in a damaged condition.

18. The storage was a good stow and the cargo did not shift during the ocean voyage.

19. On arrival at Philadelphia, the bags were in the same condition as noted in the bill of lading.

20. Philadelphia Ceiling and Stevedoring Company, as an independent contractor, was engaged, by the Holland American Line, to discharge the aforesaid cargo at Pier "B", Port Richmond, Philadelphia.

21. The shipment was not contaminated or damaged while it was in the vessel.

22. The cargo was received and carried subject to the terms and conditions of the United States Carriage of Goods by Sea Act.[1]

23. Section 1304(2) (n) of the above act states:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from —(n) Insufficiency of packing."

24. The insufficiency of packing combined with the wetness of the wrapping material caused a microbial action resulting in a rotting and decomposition of the aforesaid material.

25. Respondent, Holland American Line did not commit any act of negligence that caused damage to the cargo either during the loading, stowing, or on the ocean voyage.

26. Upon arrival at the point of destination, the discharge of the cargo by the Philadelphia Ceiling and Stevedoring Company was accomplished in a reasonable and prudent manner.

27. It took several weeks to repackage the bags of fiber at the point of origin.

28. It required more than two months for the libellants to arrange for and complete repacking on the pier.

29. In light of the above, it would be unreasonable to impose upon the respondents the obligation of recoopering the bags of fiber before unloading and discharging the cargo.

30. Under all the circumstances the stevedores used reasonable care in depositing the cargo onto the pier.

31. After the libellants had repacked the fiber on the pier, they sold it for a consideration of $106,176. Their total expense was $97,265.14 leaving a net profit of $8,910.86.

32. Whatever contamination by peat moss was inflicted upon the fiber relates back to the insufficiency of packing at the point of origin and this was the proximate cause of any damage that occurred to an uncertain portion of the total cargo involved in this action.

## DISCUSSION

We turn to the factual situation which gave rise to this law suit. Bayer Leverkusen, a manufacturer of fabric whose plant was located near Bremen, Germany, had offered for sale a quantity of acrylic fiber that had been damaged in a flood that had inundated the warehouse and grounds where the fiber was stored. The libellants entered into a joint venture to purchase this material. After inspecting a portion of the entire lot the sale was consummated and the invoice therefore, bore the notation, "as is"—"Acrylic * * * waste of flood staple fiber, tow, combed and torbo tops". The inspection also revealed that the burlap bags containing the fiber were wet and torn and that some of the fiber was loose. The condition of the

1. 46 U.S.C. § 1301 et seq.

containers necessitated recoopering. For this purpose the libellants engaged the services of Uhlmann & Co. to rebag the covering enclosing the fiber and to arrange the shipping of it to Philadelphia. The recoopering process consumed several weeks during which time certain parts of the entire lot were subjected to further wetting by heavy rains that lasted for a period of two to three days. The repackaged burlap bales of fiber were then loaded upon a lorry and driven to open freight cars and then transported to the Port of Bremen to be loaded into the hold of the ship "Sloterdyk". When the cargo reached the loading pier the personnel of the vessel inspected the cargo and were not satisfied that the recoopering was sufficient to meet the requirements of proper packaging. After considerable dialogue between the libellants' agent and the ship's officers a bill of lading was issued and accepted bearing the written expression "all bags more or less wet, wrappings partly torn and in bad condition. Contents partly exposed". The cargo, consisting of 1874 bags in various sizes, was then placed into cargo nets to be stowed aboard the ship. Six hundred and seventy five bales were stowed in the upper 'tween deck of No. 6 hold and the balance in the upper 'tween deck of No. 5 hold. The bales were stowed bale to bale, three tiers high with dunnage separation placed between the tiers. Upon arrival at its point of destination in Port Richmond, and when the hatches were opened, an inspection of the cargo area revealed that the shipment was in the same condition in which it had been stowed at the point of origin and had not shifted during the ocean voyage.

The respondent, Philadelphia Ceiling and Stevedoring Company was retained to discharge the cargo. Its examination of the shipment disclosed that the bags were still wet. When the stevedores attempted to handle the bags they disintegrated spilling the fiber out of the bags. The rotting of the burlap bags was attributed to the fact that the wetness of the wrapping material caused a microbial action that resulted in a decomposition of the burlap. Eventually, through a process of rolling and lifting, the bags were deposited on to a general cargo deck. Ordinarily, if the cargo had been properly bagged, it would have occupied three bays on the dock but because of the torn and loose condition of the bales they took up eight or nine bays. This resulted in a part of the fiber coming into contact and being commingled with peat moss which had been stored at the terminal point of where the instant cargo was deposited. The fiber remained on the dock for a period of approximately two months during which time the bales were recoopered and finally sold for $106,176 resulting in a net profit to the libellants of $8,910.06. The monetary loss claimed by the libellants is predicated upon a loss of market coupled with specified costs totaling $88,726.54.[2] In support of this claim the libellants introduced evidence indicating that they had entered into a contract with a yarn company who agreed to purchase the acrylic fiber. This contract was cancelled because of the contamination of the fiber by being commingled with peat moss. The measure of damage claimed is the loss of profit and additional expenses. We have stated only the facts which we deem necessary to decide the issues.

The theory of the libellants case is that the Holland American Line is liable for permitting the cargo to be contaminated by peat moss on board the ship, on the pier in Philadelphia and in permit-

---

2. The itemized claim of libellants is:

| | | |
|---|---|---:|
| (a) | Loss of Market | $67,767.19 |
| (b) | Additional costs incurred due to damage resulting from discharge. Domestic Freight | 3,179.18 |
| | Handling, storage and processing costs | 16,815.81 |
| | Miscellaneous supplies | 964.36 |
| | Total Claim | $88,726.54 |

ting the unloading stevedore to use improper means i.e. hooks, fork lift trucks and slings in unloading libellant's cargo. Secondly, that the Philadelphia Ceiling and Stevedoring Company is liable for employing improper work methods i.e. hooks, fork lift trucks and slings in unloading libellant's cargo and in placing the cargo in areas on the pier where peat moss contaminated the cargo.

The respondents defend by charging that the libellants knew or should have known that all the bags were more or less wet, wrappings partly torn and in bad condition with contents partly exposed at the time it was loaded aboard the vessel on June 15, 1962; that the shipment outturned from the vessel in a condition to be expected as shipped; that the unloading of the cargo and its storage on the pier was performed in a reasonable manner and that the respondents did not commit any act that rendered them liable for the alleged loss. Conflicting testimony was presented by the respective litigants. The libellants offered the testimony of Paul S. Keeler. This witness is an expert in stevedoring. Admittedly, he never saw the cargo. However, in answer to hypothetical questions he in substance stated that in his opinion the cargo should have been stowed in bulk pile, not package on package, that prior to unloading the cargo the bales should have been recoopered, that under the circumstances of discharging a cargo that consisted of wet bales with contents partly exposed, which had not been recoopered, other methods than those used by the stevedores should have been adopted. In contradiction the respondents introduced the testimony of Captain Arend Dammers, Master of the vessel, who in detail described the manner in which the loading storage was executed, the materials used to protect the cargo from coming into contact with the bales of peat moss also stored in the hold, and stated that the stowage was according to the rules and that it was a good stow;

the additional testimony of Johannes Van Essen, Chief Officer of the "Sloterdyk" who corroborated his captain's evidence and that of William Coyle, who was the foreman in charge of the unloading operation. In minute detail he graphically pictured the appearance of the bags of fiber, the great difficulty in handling the cargo, the method finally determined upon as the proper one to accomplish the unloading and categorically said:

> Q. Sir, in your experience, forty four years on the waterfront as a foreman, have you ever seen anything like this before?
>
> A. I never had. I hope I never will.
>
> Q. Sir, can you tell the Court any other way this cargo could have been discharged?
>
> A. No, I could not.
>
> Q. As it was on that pier?
>
> A. No. I would have to do the same job over what I done on that job.[3]

It is within the province of the trial judge to determine credibility. Beggs v. Dougherty Overseas, Inc., 287 F.2d 80 (2d Cir. 1961); Hedger v. Reynolds, 216 F.2d 202, 203 (2d Cir. 1954). It is our best judgment that the testimony offered by the witnesses for the respondent is convincing and more worthy of belief than that proffered by the libellants' witness.

Quite apart from our factual conclusion we also point out that under the provisions of the "Carriage of" Goods by Sea Act, (supra) the defense of "insufficiency of packing" is available to the respondents. As stated in Schroeder Bros., Inc. v. The Saturnia, 123 F.Supp. 282, 284 (S.D.N.Y.1954):

> "* * * [I]f a carrier establishes that damage is caused by one of the enumerated exceptions, it will not be held liable unless it appears that its negligence contributed to the damage, and the burden of proof upon that issue is upon the libellant". Cf. Copco

3. N.T. January 24, 1969, p. 118.

Steel & Engineering Company v. S/S Alwaki, 131 F.Supp. 332 (S.D.N.Y. 1955); Esso Standard Oil Co. v. The Kaposia, 148 F.Supp. 899 (S.D.N.Y. 1957); Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro Patrimonio Nacional, 36 Misc.2d 821, 234 N.Y.S.2d 243 (1962).

Thus, we are also of the opinion that the libellants have not sustained their burden of proving that the damage to the cargo was occasioned by any negligent act committed by the respondents.

Pertinent to the issue involved in this case is the observation of the Court in S. M. Wolff Company v. The S. S. Exira, 200 F.Supp. 809, 812 (S.D.N.Y.1961) in an interpretation of the court's opinion in Bache v. Silver Line, 110 F.2d 60 (2d Cir. 1940) wherein it was written:

" * * * The Court of Appeals of this Circuit recognized the inter-relationship between improper packaging and proper stowage. In the Bache case, the Court held that a rule of reason was to be applied in determining whether the carrier had used reasonable care in stowing the cargo considering the nature of the shipment and the type of packaging used. The Court recognized that the shipper cannot cast the burden of extra special stowage on the carrier by simply not packaging the shipment properly".

We concur with the rationale of *Wolff* and further conclude that the respondents used reasonable care in stowing and discharging the cargo.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and subject matter of the controversy.

2. Insufficient packing at the point of origin of the libellants' cargo was the proximate cause of the damage sustained by the shipment.

3. Libellants have failed to sustain the burden of proof incumbent upon them of establishing that the loss was due to any act of negligence committed by the respondents.

4. Respondents Holland American Line and Philadelphia Ceiling and Stevedoring Company are not liable in this case for loss or damage proximately caused by defect, infirmity or insufficient packing of the subject matter.

5. Respondents are entitled to a decree in their favor dismissing the libel against them, with costs.

6. Philadelphia Ceiling and Stevedoring Company is not liable in the cross action and is entitled to a decree in its favor dismissing the cross claim against them, with costs.